## <u>ADDENDUM TO FORM PRO SE 7</u>

### <u>FACTS</u>

1.  Factual allegations and assertions set out in the attached Charge filed with the Equal Employment Opportunity Commission on November 22, 2021[1] are incorporated herein as is fully set forth herein.

2.  After Plaintiff filed his charge of discrimination on November 22, 2021, when it was uncertain whether Plaintiff had successfully recovered exonerating text message evidence which Shipman & Goodwin ("Shipman") knows exists, but which it refuses to produce for nefarious reasons related to continuing to lie about Plaintiff, Plaintiff received interest from several legal employers.  E.g., Plaintiff was "unblacklisted" in the legal industry.

3.  Plaintiff was "blacklisted" throughout the entire legal industry from at least January 26, 2021 through November 22, 2021.

4.  On January 17, 2022, Plaintiff filed a Petition under Rule 27 of the Federal Rules of Civil Procedure in this Court seeking, *inter alia*, (a) a subpoena on T-Mobile US, Inc. for preservation of transaction logs of the exonerating text messages (*in camera* only or otherwise) or (b) an injunction on the Equal Employment Opportunity Commission to issue an administrative subpoena for same.

5.  The Petition for the requested relief was docketed as 3:22-mc-3 in this District.

6.  On January 18, 2022, Hon. Judge Sarala Nagala was assigned to the matter.

---

[1]    An unredacted copy will be provided to Chambers.  Plaintiff is under immense strain with his job search and wishes not to publicly name certain names not already known to be involved with the matter at this time.

7.  On January 18, 2022, Plaintiff moved for recusal of Judge Nagala on the basis of conflicted relationships with the Accuser[2] in the underlying matter, both of whom are members of a certain bar association and ostensibly know one another.

8.  In response, Hon. Nagala denied the motion for recusal (Docket 6), engaging in defamatory name calling against Plaintiff and calling him a racist in an Order entered in the body of the docket in this Court.  Plaintiff is a plaintiff in an employment discrimination action which itself alleges race discrimination.

9.  Plaintiff filed another motion for recusal on January 19 (Docket 8).

10. In response, Judge Nagala entered an Order in the body of the docket (Docket 9) which parroted back an alleged text message from an attorney serving as opposing counsel at Littler Mendelson LLP (on information and belief, Roseman) to the clerk assigned to the matter at that time (Kuegler), which charged that Plaintiff was "bonkers".  On this basis, the Court had to "recuse itself from any further participation in this matter."

11. The text message and Order also publicly mocked Plaintiff for his implicit prior assertion that he is the target of a modern genocide.  Since it is becoming increasingly apparent that this is very much true, the text message and posting of it in the body of the docket had a public propaganda component, which is an extra-judicial action or purpose.

12. All of the people involved with the text message or the posting of it in the body of the docket were either persons of color or Jews (Kuegler, Roseman, Nagala, anyone at Shipman), who all inherently hate Aryans like Plaintiff and are working in concert to genocide them and destroy America, which they also hate.

---

[2]    Plaintiff has reservations about naming her publicly at this time since he is uncertain whether (at the relevant times) she was aware of the manner in which she was being used to hurt people like Plaintiff.  Her name is apparent from the unredacted EEOC charge to be provided to Chambers.

13. On information and belief, an intent of the Order was to make Plaintiff appear to be an racist and thereby incite racial tension in anyone viewing it, in service of an apparent Zionist plan to divide and rule the gentiles and destroy America. This was an extra-judicial action.

14. Plaintiff posted the Order on his LinkedIn at approximately 5:45am on January 20, and the post was removed by a LinkedIn censor twice before 9am and reposted.

15. Also on January 20, Plaintiff called the Clerk's office of the Hartford branch of this District and was told that there were no clerks in the office through the end of the week and that, accordingly, no one could or would rule on the case. Judge Nagala's ruling (Docket 9) was accordingly intended to deny the requested and time-sensitive, evanescent relief with prejudice.

16. Also on January 20, Plaintiff called Chief Judge Underwood's chambers and spoke to a Clerk there, who was helpful and told Plaintiff that she would inform Chief Judge Underwood of the situation, but could not provide his email.

17. Plaintiff figured out the naming convention for email addresses of Judges in this District and wrote Judge Underwood by email on January 20, informing him that he believed Judge Nagala's decision had the power to undermine public confidence in the United States government and its judiciary, particularly since the Order was unusually entered in the body of the docket, and to please reassign the case.

18. Later that day (January 20), the case was reassigned to Hon. Judge Dooley.

19. The following day, Friday, January 21, Judge Dooley issued a ruling, also in the body of the docket, denying the relief on the grounds that the asserted that Rule 27 relief is unavailable to Petitioners that can presently file an action.

20. Since anyone can file an action against anyone, anytime, regardless of merit, under Judge Dooley's reading of Rule 27, there would be literally no circumstance where the Rule would ever come into play. Additionally, Judge Dooley did not rule on Plaintiff's request for injunctive relief. Accordingly, Petitioner respectfully disagrees with the ruling.

21. Judge Dooley did not accord Plaintiff's Petition the appropriate deference normally accorded *pro se* Plaintiffs or Petitioners in a federal discrimination action because of his race and because of the instructions given to her by Zionists at Shipman & Goodwin who hate Plaintiff because of his race.

22. Also on January 21, Plaintiff received an email from an attorney at the Connecticut Commission on Human Rights and Opportunities (CHRO) which stated that the requested subpoena could not be issued at the present time.

23. After this, Plaintiff had to consider the significance of the totality of these actions taken against him by Defendant, the US Government, and the State of Connecticut. Plaintiff concluded that his United States citizenship has effectively been revoked, that he no longer has any Constitutional, civil, or human rights in this country, and that, if all of the above were possible, surely there would be no way the Second Circuit would rule favorably on his appeal and a subpoena issue within one business day. Surely, Plaintiff thought, this can't be so, and there must be a job lined up for him, and that Defendant was trying to get Plaintiff to step away from this case so that he can go back to work. This was not the case.

24. Plaintiff is aware that the United States is currently in the midst of a quiet Constitutional crisis, that he is the target of a genocide, and that he no longer lives in a free country.

25. Shipman & Goodwin colluded with all relevant parties, including this Court and the law firm Littler Mendelson LLP, in undertaking the above set of actions, which were retaliatory against Plaintiff for his attempting to seek legal redress for the harms done to him by filing a legal action in the federal District Court for which Plaintiff resides.

26. Since January 20, 2022, when Shipman became aware through collusion with this Court that his Petition would be unlawfully denied, all prospective legal employers immediately cut ties with and refused to further speak with Plaintiff, and it is apparent Plaintiff has been placed back on the "blacklist," at least in the New York and DC legal markets.

27. Placing Plaintiff back on the "blacklist" is a retaliatory and coercive action and was coordinated by Shipman & Goodwin.

28. In addition, on March 7, 2022, Plaintiff learned that his appeal to the Office of Government Accountability, Firearms Permitting Board of the "constructive denial" (no response) of his March 9, 2021 application for a concealed carry firearms permit has been scheduled for July 11, 2024.

29. Plaintiff is an attorney admitted in three jurisdictions and three federal courts, and has no criminal or adverse mental health record whatsoever.

30. On information and belief, the 40 month wait imposed for a temporary pistol permit is the longest ever imposed on a law-abiding citizen in United States history.

31. This action by the Office of Government Accountability, Firearms Permitting Board is yet another unbelievable example of retaliation by Shipman against Plaintiff.

32. On January 15, 2022 Shipman, by and through counsel, filed an answer to Plaintiff's EEOC charge which contains falsifications under Oath.

<u>COUNT ONE: EMPLOYMENT DISCRIMINATION</u>

33. All previous allegations are incorporated by reference.

34. Shipman's decision to terminate Plaintiff was racially-motivated.

35. Modern Critical Theory invokes concepts introduced by Houston Stewart Chamberlain and expanded upon by Adolf Hitler and makes it clear that the racial categories properly applied to this action—and indeed everything else happening in the world today—are Aryan, Jew, Person of Color.

36. Accuser accused Plaintiff of sexual harassment because he failed to attend a mandatory critical theory indoctrination session on August 27, 2020.

37. Shipman's Firm Policy on sexual harassment permitted dating between coworkers. If one coworker can falsely accuse another of sexual harassment, and the known innocent, accused employee is effectively unable to defend himself because his doing so is considered "retaliatory" under the same policy and a grounds for termination for cause and then permanent blacklisting in his profession, then the Policy permitting dating is merely a Bolshevik trap to lure innocent gentiles into a kind of genocide. Plaintiff had no effective ability to accept the false accusation without defending himself because doing so would have resulted in his losing his law license, as Shipman made clear, and Plaintiff received clearance to contact the accuser. Shipman's interpretation of the totality of these policies is discriminatory against Plaintiff on the basis of not only his race, but his religion (which teaches you that in order to love people, you can't think or live this way), sexual orientation and gender.

38. Shipman & Goodwin dispensed with the decision to terminate Plaintiff because he is a member of the Aryan race and has demonstrated himself by his innate characteristics

hostile or likely to be non-cooperative with Bolshevism, which is being aggressively implemented in the United States, a fact recently acknowledged by the Russian government (experts in the phenomenon).

39. Shipman terminated Plaintiff for a known false reason knowing that, because Bolshevism is being implemented in the US (or at least openly pursued by Zionists) and that because Plaintiff is a slave in that system without any human rights, Plaintiff would never be able to do anything about it.

40. Members of Shipman's Management Committee knew or should have known that Plaintiff was falsely accused of sexual harassment, and accordingly that he did not violate Shipman's policy against retaliation, which has a carve out for complaints filed in bad faith (i.e., false complaints).

41. Members of Shipman's Management Committee intentionally disregarded exonerating evidence which it knows to exist and have, to this very day, undertaken massive efforts, including apparent collusion with this Court, to prevent Plaintiff from ever obtaining said evidence because they intend to turn him into a slave on account of his race.

42. Shipman failed to fully investigate and document Accuser's initial sexual harassment complaint in accordance with the relevant Firm policy.  Had Shipman fully investigated the initial complaint, Plaintiff would never have had to contact Accuser again and accordingly, he would have never have "retaliated" against her.  Shipman should have at least acknowledged this reality and owned up to the fact that it gave Plaintiff clearance to contact Accuser to clear his name, since he was "on his own" in that respect.

43. By failing to object to his planned outreach in a conference held between herself and Plaintiff on November 8, 2020, Hermann "entrapped" Plaintiff into contacting Accuser

on November 10, 2020.  Hermann also failed to inform the firm and the investigators that Accuser's complaint was in bad faith in so far as it contained substantial omissions of the most significant facts, whatever Accuser's reasons, meritorious or not.

44. Leander Dolphin, Christina Hermann and Accuser all lied about Plaintiff to hasten his discriminatory termination, and have continued to lie, as each have been radicalized and are being used as foot soldiers of Bolshevism and as a battering ram against Aryans, such as Plaintiff, so that Zionists can rule unopposed over the United States, and indeed the entire world, representing the fulfilment of a centuries-old plan for world subjugation that has entered its acute phase (as the entire world is now beginning to realize).

45. Leander Dolphin, Christina Hermann and Accuser came to hate Plaintiff for his quiet disagreement with overtly Marxist, pseudo-logical principles about race espoused in modern critical theory (for example, requiring persons of color to be treated differently on the basis of their skin color, which itself is racist) that he knows are merely to trick persons of color into thinking that people like Plaintiff are the ones who are oppressing them, when in reality it is and always was the Jews (to whom they are being unknowingly enslaved).  Because of this fundamental race-based hatred, regardless of their level of culpability or fault in terms of understanding the overall intent of the plan they are being duped by (for example, Accuser is Aryan and has no idea), each of them lied about Plaintiff and undertook discriminatory efforts to destroy his life that involved calumny on the basis of Plaintiff's race.

46. Plaintiff quietly disagreed with principles of CRT taught at mandatory race trainings and failed to attend them because they conflict with his inherent racial interests, religious and political beliefs, as well as logic and common sense.

47. False accusations of sexual misconduct were a favored tactic used by the GPU-NKVD to send members of the learned professions to gulag during the Red Terror in the Soviet Union, and are being used in the United States for similar reasons today.

48. Jewish members of the Management Committee at Shipman & Goodwin failed to object to Plaintiff's termination because they in fact desire for people like Dolphin, Hermann and Accuser to hate Plaintiff, so that they can divide the gentiles in a race war, weaken the country and ultimately rule over the world in a form of global autocracy.

49. Shipman failed to terminate a Jewish associate who had engaged in sexual harassment on multiple occasions, but terminated Plaintiff for retaliation when it was clear that he never committed either the underlying sexual harassment offense or retaliated against Accuser.

50. Plaintiff was not terminated on the basis of his performance, which was strong and indeed significantly above-average for an associate at his level.  Plaintiff's strong performance is actually a reason for his termination, since strong gentiles are capable of rousing other gentiles to oppose Bolshevism and are thus considered inherently dangerous to the system.

51. Terminating Plaintiff because of his status as a member of the Aryan race, as that term is defined under modern critical race theory (which attacks the Aryan specifically) to include the "intersectional" pre-COVID racial categories and understandings (i.e. color, religion, political beliefs, national origin, sexual orientation) was discriminatory under both 42 U.S.C. § 2000e-2(a)(1) and Conn. Gen. Stat. §§ 46a-60(a).

<u>COUNT TWO: RETALIATION</u>

52. All previous assertions are incorporated by reference.

53. Shipman & Goodwin retaliated against Plaintiff within the meaning of 42 U.S.C. § 2000e-3(a) and Conn. Gen. Stat. § 46a-60(a)(4) multiple times for engaging in protected speech and defending himself from a known false and discriminatory sexual harassment allegation and the adverse changes to his employment circumstances that arose from it.

    a. Modern Critical Theory specifically targets Aryan whites and is inherently hostile to virtually all aspects of Plaintiff's racial character and deeply held political and religious beliefs. CRT is overtly Marxist propaganda designed to engender needless hatred and division among the gentile population.

    b. After Plaintiff quietly failed to attend mandatory race-related Marxist indoctrination and training sessions during the spring and summer of 2020, Shipman instructed Accuser to falsely accuse Plaintiff of sexual harassment.

    c. After Plaintiff failed to attend the August 27, 2020 indoctrination session, two days later, on August 29, 2020, Shipman partner and Zionist Dan Schwartz sent an email to all associates warning that sexual harassment was a grounds for disbarment, suggesting that the Firm knew about Accuser's complaint before the date they say they first knew about it, which was September 1, 2020. Shipman has recently lied under Oath about the existence of this email.

    d. On September 1, 2020, Accuser filed the false sexual harassment complaint. Because Plaintiff had done nothing wrong he was cleared of wrongdoing, but no record was made of his being cleared. The failure to document the complaint and its resolution in writing was retaliatory; in effect Plaintiff failed to give Shipman what it wanted (a grounds for termination) and so there was no need to document the resolution, which would have protected Plaintiff from future trouble,

eliminated rumors and additional accusations about the same conduct. Shipman
left the matter open so that it could later frame him for sexual harassment, which
it attempted to do on November 5, 2020.

e.  Plaintiff's failure to attend the sessions upset both the Jewish attorneys involved
and also the Persons of Color involved. For the former, Plaintiff's failure to
attend indicated to them that he cannot be swayed by the nonsensical pseudo-logic
of CRT, and would thus be noncompliant with a planned Bolshevik overthrow of
the US government, and would attempt to stir others in opposing same. For the
latter, Plaintiff's failure to attend was an indicator that he was just another
Oppressor going on oppressing, but in reality, Plaintiff was not and is not capable
of oppressing anyone, nor would he if he could.

f.  Partners at Shipman began to treat Plaintiff differently in the wake of these
actions and began laying the groundwork for a termination, pulling him off of
projects and assigning him junior, insular work of short-term duration. Other
associates and staff began to treat Plaintiff as though he was guilty of something,
prompting Plaintiff to wish to resolve whatever was left open about the matter
with Accuser so that his employment circumstances could return to normal.

g.  Shipman placed Plaintiff on a paid leave of absence after he engaged in self-help
actions which HR was informed of and knew about to and which were designed to
resolve the state of affairs between himself and Accuser.

h.  The leave itself was retaliatory in so far as there was no practical need to block
Plaintiff from accessing the firm's computer system other than to prevent him
from defending himself. The purpose of placing employees on a paid leave is in

general to remove people from the workplace who are a danger to other employees by their presence, which rationale does not hold up in a remote work environment nor on these facts.  In other words, Shipman retaliated against Plaintiff not for anything he did, but rather because he disagrees with the ideas and principles that underlie the entire set of actions, and wanted to ensure that he could in no way defend himself and thus advocate for his deeply held beliefs, etc. It is the same reason the GPU-NKVD were so harsh to prisoners sent to gulag; the idea is for no counter-revolutionary ideas to ever reach other gentiles.

i.  The firm intended to terminate Plaintiff on January 4, 2021, before Plaintiff ever had a chance to respond to Shipman's findings, again because Shipman's partnership simply finds his disagreement with the underlying ideas and principles to be unacceptable.

j.  During the investigation, Shipman retaliated against Plaintiff for attempting to defend himself.  The firm calls his defensive ideas "inflammatory" in its termination report.  These retaliatory actions included failing to respond to his inquiries about his procedural rights, the nature of what was being investigated, blocking his email, refusing to provide him with evidence the Firm possessed but simultaneously requiring him to produce all of his evidence on penalty of termination (he did not comply), failing to permit him to access exonerating evidence in the firm's computer system, giving him only 2.5 days to file a rebuttal to it draft termination report which contained lies (while also not permitting him access to evidence he needed), failing to respond to requests for information, etc.

k.  Dolphin's January 5, 2021 email conditioning Plaintiff's continued employment on his providing any and all evidence in his possession was retaliatory against Plaintiff in so far as it had no nexus to any kind of reasonable discovery procedure in the investigation and was again, merely to brutalize Plaintiff on account of his Aryan race and his beliefs.  For example, Plaintiff could file a rebuttal, but was only permitted to do so using evidence he had printed out or saved prior to being placed on a leave, yet simultaneously he was required to provide the firm all the evidence he had.  Shipman had already formed a clear intent to terminate Plaintiff and did this merely to determine about which matters and to what extent they could credibly lie about Plaintiff to destroy his life, and to assess the litigation risk presented by their lying.

l.  The action taken to terminate Plaintiff for "retaliation" because he defended himself from a false accusation by an approved means is itself inherently retaliatory.  E.g., it was not Plaintiff's *actions* that caused the termination, but rather that he even dared defend himself at all.  Shipman, Dolphin and Herrmann evidently believe that a person in Plaintiff's position should just accept the false accusation and let themselves be disbarred ***because they simply want to remove people of Plaintiff's race from society by any available means***.

m.  Shipman's asserting that Plaintiff could not record the investigation interviews, while they proceeded misquoting Plaintiff and shamelessly lying about him, was again retaliatory toward Plaintiff for his defending himself and his beliefs or otherwise asserting his rights.

n.  In response to a letter sent to Accuser in March, 2021, Shipman responded by threatening to file ethics charges and, apparently a defamation lawsuit against me because I asserted that Accuser had fabricated the accusation.  This was simply a retaliatory and abusive means of intimidating Plaintiff into silence.

o.  In response to a letter asserting that Plaintiff might file legal ethics charges against Dolphin in October, 2021, Shipman filed a false police report with the Hartford Police Department, the apparent intent of which was for the Officer to have social workers sent to Plaintiff's abode so that they could falsely declare him insane.  When Plaintiff made it clear that he was recording the conversations with the Police, the Police immediately stopped making statements about Plaintiff's mental health.  The GPU-NKVD did this very same thing during the Red Terror.

p.  On information and belief, Shipman directed the EEOC to try to block Plaintiff from filing a charge of discrimination in November, 2021.

q.  In response to my filing an EEOC charge on November 22, 2021, Shipman had two agents from the Hartford Metropolitan Mobile Crisis center appear at Plaintiff's door unannounced (Plaintiff did not answer).  The intent of this had nothing to do with Plaintiff's mental health but rather was again, a shameless attempt to have Plaintiff declared insane so as to intimidate him into silence or otherwise impair his ability to bring a discrimination action.

r.  Shipman instructed Roseman at Littler Mendelson to send the defamatory text message to Kuegler, and on information and belief colluded with Hon. Nagala in preparation of the Orders at Dockets 6 and 8 in the matter 3:22-mc-3-KAD, which

were entered in the body of the Docket as a means of intentionally defaming

Plaintiff and removing him from the legal profession.

s.   Shipman has colluded with other law firms and professional associations to

"blacklist" Plaintiff from the legal profession.  This has occurred to prevent

Plaintiff from (a) ever being able to afford to bring a lawsuit using external

counsel, (b) to otherwise remove him from society on account of his ideas being

deemed hostile to Bolshevism and (c) to cleanse the profession (and indeed the

elite ruling class of the country) of Aryans that possess Plaintiff's characteristics.

## COUNT THREE: WRONGFUL TERMINATION

54. All previous assertions are incorporated by reference.

55. By abusing, terminating and retaliating against Plaintiff on the basis of his deeply held

personal beliefs protected by the First Amendment (racial interests, religious, political

and philosophical beliefs, and sexual orientation), as set forth fully above, Defendant has

violated Conn. Gen. Stat. 31-51q.

## COUNT FOUR: DEFAMATION OF CHARACTER

56. All previous assertions are incorporated by reference.

57. Defendant has engaged in defamation of Plaintiff in virtually every way imaginable, and

repeatedly painted Plaintiff in a false light, both in written materials circulated within

Shipman & Goodwin and externally, in the manner described above.

58. Defendant undertook their defamatory actions with premeditation and actual malice and

for this reason have undertaken significant efforts to prevent Plaintiff from acquiring

exonerating evidence known to exist, since such evidence would tend to conclusively

demonstrate that the actions were taken with premeditation, racial animus and actual malice.

### COUNT FIVE: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

59. All previous assertions are incorporated by reference.

60. Defendant's actions, which at this point amount to Plaintiff's "informal" exclusion from not only Shipman & Goodwin, but also his profession, social circles, and from many of the basic privileges of citizenship in the United States, were calculated and intended to cause immense mental anguish and have done so.

### DAMAGES

61. All previous assertions are incorporated by reference.

62. Plaintiff has suffered general and special damages, including a severe degree of mental stress and anguish which have disrupted his daily routine and caused him to lose nearly all his friends and even some family members (who are turning their back on him because his survival requires him to criticize Jewish people).

63. In addition, Plaintiff has been "blacklisted" from the legal establishment either directly or indirectly on account of Defendant's actions and is unable to find suitable employment anywhere. Because Shipman and Accuser refuse to clear his name, they have forced him to have to defend himself in this manner and have thus opened him up to an onslaught of defamatory and career-ending attacks and name-calling that naturally occur any time a gentile is forced to publicly criticize members of the Jewish race. Because of Plaintiff's severe student loan debt burden, if his legal career is not permitted to continue he will effectively be unable to afford a family for the foreseeable future.

64. In addition, Plaintiff has suffered severe mental anguish that has caused him to have to look deeply into history for an explanation of what has happened and is happening to not only him but to his country, causing him to read the writings of Alexander Solzhenitsyn (on Bolshevism) and Adolf Hitler. The anguish associated with the realization that many of Hitler's ideas may be true and indeed centrally relevant to current world events has disturbed Plaintiff to the core of his soul and caused him immense sadness and pain.

65. Plaintiff has suffered damage to his reputation and image, both up to the present and into the future.

66. Defendant undertook its actions, which continue to this day, with a degree of malice previously unimaginable to Plaintiff and which have caused a shift in his basic understanding of human relations and of race.

67. Plaintiff is entitled to back pay, front pay, nominal, compensatory and exemplary damages in an amount to be determined at trial as well as a judgment clearing his name.

68. Plaintiff is also entitled to pre-judgment and post-judgment interest, costs of court, and fees to be determined at trial.

Respectfully Submitted,

_____/s/_____
Joseph Indelicato, Esq. (#4537)
30 Arbor St., Apt. 422
Hartford, CT 06106
Jindelicato3@gmail.com

# ATTACHMENT 1
TO
ADDENDUM TO FORM PRO SE 7
(EEOC CHARGE)

# EXHIBIT 1



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## CHARGE OF DISCRIMINATION

EEOC Form 5A (October 2017)

| For Official Use Only – Charge Number: |
|---|

| **Personal Information** | First Name: Joseph   MI: J   Last Name: Indelicato III<br>Address: ███████████   Apt.: ███<br>City: Hartford   County: ███████   State: ██ Zip Code: ███<br>Phone: ██████   Home ████████████   Email: ████████████ |
|---|---|
| **Who do you think discriminated against you?** | Employer ☑   Union ☐   Employment Agency ☐   Other Organization ☐<br>Organization Name: Shipman & Goodwin LLP<br>Address: One Constitution Plaza   Suite: _____<br>City: Hartford   State: CT   Zip Code: 06103   Phone: _____ |
| **Why you think you were discriminated against?** | Race ☑   Color ☑   Religion ☑   Sex ☑   National Origin ☑   Age ☐<br>Disability ☐   Genetic Information ☐   Retaliation ☑   Other ☐ (specify) |
| **What happened to you that you think was discriminatory?** | Date of <u>most recent job action</u> you think was discriminatory: 1/26/2021<br>Also describe briefly <u>each job action</u> you think was discriminatory and when it happened (estimate).<br><br>See attached charge.<br><br>Re: Inquiry ██████████ Indelicato v. Shipman & Goodwin |
| **Signature and Verification** | I understand this charge will be filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address, phone, or email. I will cooperate fully with them in the processing of my charge in accordance with their procedures.<br><br>I understand by signing below that I am filing a charge of employment discrimination with the EEOC. I understand that the EEOC is required by law to give a copy of the charge, which includes my allegations and my name, to the organization named above. I also understand that the EEOC can only investigate charges of job discrimination based on race, color, religion, sex, national origin, age, disability, genetic information, or based on retaliation for filing a charge of job discrimination, participating in an investigation of a job discrimination complaint, or opposing job discrimination.<br><br>**I declare under penalty of perjury that the above is true and correct.**<br>Signature: ████████████   Date: 11/22/2021 |

## EMPLOYMENT DISCRIMINATION COMPLAINT
### INDELICATO v. SHIPMAN & GOODWIN LLP

A reading from the Gospel of John, Chapter 15 (emphasis added).

18 "If the world hates you, keep in mind that it hated me first.
19 If you belonged to the world, it would love you as its own. As it is, you do not belong to the world, but I have chosen you out of the world. That is why the world hates you.
20 Remember what I told you: 'A servant is not greater than his master.' If they persecuted me, they will persecute you also. If they obeyed my teaching, they will obey yours also.
21 They will treat you this way because of my name, for they do not know the one who sent me.
22 If I had not come and spoken to them, they would not be guilty of sin; but now they have no excuse for their sin.
23 Whoever hates me hates my Father as well.
24 If I had not done among them the works no one else did, they would not be guilty of sin. As it is, they have seen, and yet they have hated both me and my Father.
25 But this is to fulfill what is written in their Law: **'They hated me without reason.'**

I was fired from my job at the law firm Shipman & Goodwin LLP, and have subsequently and permanently lost my legal career, the product of consistent, extreme effort for the past 20 years of my life, because I disagree with Critical Race Theory (CRT), and, because I do, I believe that race is an inappropriate consideration in any employment decision. I possess the racial characteristics of a disfavored race under CRT, which calls me an "Oppressor", and openly advocates for my removal from society and extermination from the planet. Because I am an "Oppressor", I was removed from my role by force using the means of a known false sexual harassment accusation, and when I objected to this, I endured the most openly racially biased and violent employment investigation likely in the history of American industry, was terminated for cause, have endured attempts to have me forcibly confined, and have been blacklisted by the entire legal establishment. By all indications, my former employer intends to actually cause my death, disbarment, forcible confinement, or some combination of these outcomes. The amount of animus displayed toward me is at best a departure from important norms and at worse, outright criminality prosecutable as a hate crime or as domestic terrorism.

CRT is a secular religion. See generally, V. Ramaswamy, Woke, Inc.: Inside Corporate America's Social Justice Scam (Center Street Publishing, New York, 2021) (arguing that CRT meets the Supreme Court's standard for a religion). CRT tells me that the people around me that have more melanin in their skin than I do are inherently less than me, and that, although I have done nothing wrong to any person of color in my entire life, that I am their mortal enemy and their "Oppressor." It says that, because of the sins of people like me, persons of color have a different set of rights than I do, and that I have no rights at all. One of these rights is the ability to take my job simply because they have more melanin in their skin than me. CRT says that any objection of mine to this is just me oppressing, and that I have no rights anyway. In short, CRT says that I am not allowed to treat persons of color around me as my equal and love them as my equal, because I am simultaneously more and lesser than them.

- 1 -

The church of CRT has become our public schools and offices, and Shipman & Goodwin is one of its largest cathedrals. The Co-Managing Partner of the firm, Leander A. Dolphin, is one of its most influential secular priests, and a frequent speaker on CRT to various audiences. On information and belief, at all relevant times, Dolphin had unilateral control of hiring and firing decisions, personnel matters, etc., and served as the lead investigator in the employment investigation that resulted in my termination.

The religion I practice is called Christianity. It was first taught by Jesus of Nazareth, whose ministry began in ~30 AD. Jesus believed that you should love the people around you, try to understand their soul, forgive them for their sins, and treat them as your equal. (12 My command is this: Love each other as I have loved you. 13 Greater love has no one than this: to lay down one's life for one's friends. John 15:12-13.) Jesus said that when we love one another, all kinds of awesome stuff happens without us even trying to make it happen. (37 For here the saying is verified that 'One sows and another reaps. 38 I sent you to reap what you have not worked for; others have done the work, and you are sharing the fruits of their work.' John 4:37-8.) Jesus called this thing the "Holy Spirit", and it is the central concept of Christianity. I believe in this thing called the Holy Spirit, and in this guy called Jesus Christ. I wear a crucifix around my neck to remind me to love him, and to love others, too, in all that I do, every single day. I never take off my crucifix, and will be buried with it.

Jesus said that his message was "the light of the world." John 8:12. The Gospel of John, the book that teaches the story of Jesus as God-Man, in my opinion the centrally-important Gospel, begins with one of the most famous passages in all of English prose:

> In the beginning was the Word,
> and the Word was with God,
> and the Word was God.
> He was in the beginning with God.
> All things came to be through him,
> and without him nothing came to be.
> What came to be through him was life,
> and this life was the light of the human race;
> **The light shines in the darkness,**
> **and the darkness has never overcome it.**
> **John 1:1-5.**

CRT makes me a racist for being profoundly touched by these words, because the dialectic between the "light" and the "dark" itself is racist, and people talking about the "light" is just another way of them oppressing. See R. Delgado and J. Stefancic, Critical Race Theory: An Introduction, 85-6 (NYU Press, 3d. ed. 2017). In other words, CRT says that Jesus Christ is a racist. CRT makes everything about loving people of color racist and is explicitly designed to divide people so that they become scared of one another and hate one another, so that in 2024, all persons of color and immigrants vote democrat. If that happens, the United States will become a one-party state, and ergo a giant communist toilet, by mathematical and demographic certainty.

CRT conflicts with my religion and with the religion of millions of other Americans.

Unlike my religion, the religion of CRT comes with a special rule. If you don't agree with it, you don't get a paycheck. Worse, you will never get another one for as long as you live.

## My Race under Modern Critical Race Theory

Delgado and Stefancic recognize that race is an illusory and amorphous construct. "For example, early in our history Irish, Jews, and Italians were considered nonwhite—that is, one a par with African Americans. . . . Whiteness, it turns out, is not only valuable, it is shifting and malleable." R. Delgado and J. Stefancic, Critical Race Theory: An Introduction, 88-9 (NYU Press, 3d. ed. 2017), I am an Italian-American, Sicilian, and my family came here in 1918. However black you are, in my soul I am at least as black as you, and I am the original gangster in America. My people were nothing here and aren't much better off now. We only rose by robbing and stealing from the same people CRT views as "white" until they eventually realized we were kind of smart. But because I have white skin, I am considered an "oppressor?" No, I am a competitor, and CRT allows persons of color to use their skin color to gain an advantage over me.

Critical Race Theory (CRT) is "a race-based, systematic critique of legal reasoning and legal institutions" which contemplates "studying and transforming the relationship among race, racism, and power". Id. at xv, 3. Under CRT, "race and races are products of social thought and relations. Not objective, inherent, or fixed, they correspond to no biological or genetic reality; races are categories that society invents, manipulates, or retires when convenient." Id. at 9.

CRT examines "economics, history, setting, group and self-interest, and emotions and the unconscious" through a racial lens and "questions the very foundation of the liberal order, including equality theory, legal reasoning, Enlightenment rationalism, and neutral principles of constitutional law." Id. at 3. CRT charges that "Western philosophy is inherently white in its orientation, values, and method of reasoning," id. at 8, and considers principles of liberal democracy, such as equality, "color-blindness and neutral principles of constitutional law", to be inherently racist and oppressive. Id. at 28. Shockingly, "[c]rits are suspicious of another liberal mainstay, namely, rights . . . moral and legal rights are apt to do the right holder much less good than we like to think." Id. at 28-9.

CRT introduces a concept called "intersectionality", where one's race is the product of the combination of a person's skin color, gender, religion, sexual orientation, political beliefs, interpersonal characteristics and social attitudes. Id. at 58. I am a Christian (Catholic), heterosexual, Caucasian male, and a member of the Republican Party. I am considered a "conservative", but have liberal beliefs about most social matters. For example, I support gay marriage (the freedom to love people), abortion rights, and green energy. My conservatism is mainly a result of my legal, political, and economic leaning to liberalism in all areas. I am a Constitutional conservative, meaning I tend to interpret laws and legal, social and economic issues through a lens designed to preserve liberty and free choice. I believe that American democracy is the pinnacle of human civilization, and have sworn an Oath to protect and defend

the Constitution of the United States. Although I do not generally openly discuss my political or religious beliefs, they are reflected in all that I do, write, and say, every single day.

One of these liberty-centric beliefs is "color-blindness." I have lived and worked around people of color for my entire life, count many as my close friends, and do not treat people differently on the basis of the color of their skin. I have never treated a person of color different from me in my entire life, and would view doing so as a sin. I believe that when we treat others differently because of their race, it prevents me from getting to know, love and understand their soul, and therefore prevents the action of the Holy Spirit from working in any interaction I have with that person. Before CRT, I didn't even ever notice that someone was black or brown, and merely viewed it as a physical characteristic like height, build, eye color, etc., and to the extent it gave me a clue about their family history and culture, and how I might better get to know them. I only notice race now because CRT makes me afraid of people that are black and brown, who I view as effectively Nazis in the new global racial order. CRT has forced me to view myself as a member of a distinct and disfavored race, which I never did before, and it has caused me immense pain.

Because of the "intersectionality" of my various racial characteristics, particularly my skin color, gender, religion, and political beliefs, social attitudes, and interpersonal characteristics, I am squarely considered a member of the "Oppressor" race under CRT. The differential and horrendous treatment I endured at Shipman & Goodwin and since is the result of my "race" as a whole, or any of these distinct intersectional components of my "race."

If we are to be intellectually honest, by the plain meaning of the words of Delgado and Stefancic describing CRT, Adolf Hitler founded it and was its most prolific and influential practitioner. His version merely reached a different conclusion about the "Oppressor" race, which he called "Aryans." The fact that Hitler founded CRT should give us all a clue about the immense danger inherent in institutionalized ideas that favor and disfavor people because of their racial characteristics. A good short-hand to understand who the disfavored "Oppressor" group is under modern CRT, is to examine who would have been considered an "Aryan" in the Third Reich – generally white, Indo-European, heterosexual Christians like me.

Hitler's CRT concluded that "Aryans" possessed a kind of psychic or spiritual power not possessed by other races, that this power made them "idealists" who were willing and capable of sacrificing their lives and their work solely for others, and that these characteristics made them uniquely adapted to creating social institutions and culture, and therefore the de facto ruling class of the world. Aryans possessed the characteristics of hard work, intelligence, honor, integrity, creativity, and initiative, which were all products of this psychic power he believed they had.

I possess "Aryan" characteristics. I have a very high IQ, I work very hard and always have, I am honest to a fault, I live my life with honor and integrity, and I am viewed as a thought leader wherever I go. I unapologetically believe in the value of liberal democracy and view all people as my equal, and know that diversity, equity and inclusion is a natural byproduct of the institutions of liberal democracy and Christianity and, to the extent it is not, believe we need to double down on caring for one another to make the system work better, not give up on it. In short, I am an "Oppressor" and an "Aryan", viewing CRT as a whole.

- 4 -

These characteristics were once valued in American society, with those possessing them generally advancing, but they are now disfavored and considered even dangerous characteristics of the "Oppressor" class. These characteristics are incompatible with communism and only make someone a success in a free society, which the current CRT/"Woke" religion directly says is inherently oppressive to persons of color and thus must be destroyed and replaced. I incorporate here my article "Yes, Adolf Hitler founded CRT. He was also the first to describe "cancel culture." What my termination from a major law firm can teach us all about the dangers of political extremism and CRT in 2021." As I mention in my article, I believe that "cancel culture" is being used by the democrats and Antifa (just as it was used in Germany 100 years ago), in conjunction with the developing domestic terror law, to actively promote and spread communism in the United States. I believe "Antifa" is called that because it is the inverse of National Socialism on the political spectrum, e.g. communism ("Anti-Fascism"), with the express purpose of using CRT as a weapon to openly and actively promote communism in the United States, and eliminate the class that would or could block the spread of communism, which it calls Oppressors. Because of my "Oppressor" characteristics and intellectual ability, particularly concerning matters of politics and history, I am considered a free-thinking member of the "intelligentsia" class, which is always the first to be liquidated in a communist revolution. I am being eliminated entirely, and the result of the above process will ultimately be my death.

All the relevant individuals responsible for my discrimination are either persons of color, Antifa members, Jews or all three. As I mention in my article, as has occurred before in history, particularly in Germany, once CRT and Marxism descend into the mainstream, a kind of polemic develops between my group and these groups. This polemic has existed since the beginning of time, starting with the circumstances leading up to the death of Jesus Christ at age 33. It hurts me to the core of my soul that this is happening in our society, and like many others I never could have imagined it would. I am trying everything I can to stop the process before it is too late. This polemic is the most destructive force in all of history. It has never yet been resolved.

**Discrimination**

1. In January, 2019, I was terminated from my job at the public accounting firm RSM US LLP in Washington, DC, because I disagreed with a false performance appraisal filed against me (a "Performance Improvement Plan" or "PIP") and refused to sign it. I contemplated suing for gender or political discrimination, but never filed the complaint.

2. In June, 2019 I interviewed with a law firm called ███████████████████, in ████████████. I interviewed with several junior associates at the firm, all of which women. I did not get the job, but was told by the recruitment manager that "the good news is that all the female associates you interviewed with felt comfortable that they could work with you late into the night." I was troubled by this statement and considered it extremely odd.

3. In July, 2019 I complained to a contact at ████████████████████████████ ████ and inquired whether false rumors had spread about me to the effect that I was a creep or a danger to women working with me. I was told no such rumors had spread.

4. In July, 2019 I was offered a position as a first-year associate at the law firm Shipman & Goodwin LLP ("Shipman").

5. I began working at Shipman on August 12, 2019. I was resident in their Hartford, CT office, where I practiced tax and employee benefits & executive compensation.

6. In September, 2020, I met the most beautiful woman I had ever met in my life, another first-year associate starting at the firm, named ███████. ███worked in the ████████████department at the firm and did debt capital markets work.

7. ████is a ███████████woman. Her family is from the██████████████████

8. ███and I became friends over the next few months, were inseparable whenever we could be together, and began talking about spending time together outside of work. She seemed extremely interested in me and we flirted frequently. I began to care about her and feel protective of her, and offered to repair her car and bring her soup when she was sick. I have never been nicer to another person in my entire life.

9. In November, 2019, ████████████████████████████████████ thanked her,████took a gulp of her champagne and moved in very close to me (akin to the position your girlfriend might take if you were at a concert together). I viewed this as her sending a clear signal that she wanted to see me outside of work.

10. In November, 2019 I dumped the girlfriend I had in the Hartford area, and████and I contemplated lunch and other plans, which I subsequently cancelled.

11. In December, 2019, at the office Christmas Party,████wore a see-through mesh top and invited me to attend an after-party with her and another colleague (██████ ████████. I declined the offer and never made a comment about her attire that evening. I got an instinctive feeling at the party that████was wearing that dress to incite me to make a comment about it in front of others, particularly████████ ████████████████████did not work for the law firm).

12. Before the party, a partner that I worked ████████ was insistent that I attend the party early and encouraged me to begin drinking. I declined, and had only one beverage and returned to my desk, only returning to the party after completing a document I had been working on.

13. ████████ had a picture of an ████████family on her wall next to her desk. The picture was printed on computer paper, unframed, and appeared to have been crumpled in an attempt to make it look older than it was. I never inquired about the reasons she had this picture.

14. In December, 2019, on one morning, ████████car appeared to pull out from a parking spot on the street in front of the garage and pull in front of mine as I was approaching, such that we were likely to interact in the parking garage. I got the same instinctive feeling I had at the Christmas party that something was amiss, and did not park anywhere near her nor interact with her on the way in to the office. On the walk into the office through the garage, an attorney named████████████████████), ████████and his boss, an attorney named ████████████ each emerged from different corners of the parking garage and took their positions walking behind me, as though they were planted witnesses to a staged incident of sexual harassment. However, since I did not interact with████ there was nothing for them to use.

15. I remembered the off-color remark made to me by the recruitment manager at████ ████████████and began to become suspicious that the law firm was attempting to

frame me for sexual harassment as a means of eliminating me from the legal profession. I became cautious and suspicious of ▆▆▆▆ and kept her at arm's length for the remainder of December and almost all of January.

16. By the end of January, after several ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆ regained my trust. I dismissed my suspicious as paranoid thoughts.

17. The week of January 20, 2020, I wrote and had published an article about a new legislative drive and on Friday the 24th, I presented to a large group about the legislation in a well-attended webinar.

18. On information and belief, on Thursday, January 23 or Friday, January 24, I also filmed a ▆▆▆▆▆▆▆▆▆ skit for the partnership promotion dinner in February, 2020. The skit was for the promotion of Hathorn and written by ▆▆▆▆▆▆▆▆ my supervisor in the tax department. The skit generally portrayed me as a bumbling idiot who did not know or understand basic rules of employee benefits law, and who was generally inferior to my colleague ▆▆▆▆▆▆▆▆ who was portrayed as a "whiz kid". I was a good sport about it but was mildly offended.

19. The next day (January 25, 2020), a rainy night, I decided to take a break from my work and try to build my social connections in Hartford. I invited ▆▆▆ to attend a movie with me by email on the firm's email system. ▆▆▆▆ accepted and responded with her personal phone number (732-259-1140). ▆▆▆ and I planned a date in which I would meet her around 9pm for drinks, and we would attend a movie a couple hours later. We went to a wine bar called Barcelona in West Hartford, and then to the movie theater close by, catching a late screening of the movie "1917".

20. We had a fun time in the theater and left the theater some time after midnight, and Parikh invited me back to her apartment in the area, to have more drinks and to ▆▆▆▆▆▆▆▆▆▆▆ I accepted.

21. At her apartment, ▆▆▆▆ and I engaged in an excellent hours-long, wide ranging and intimate conversation about a variety of topics, including our families, religion, politics and race. I told ▆▆▆ that I thought she was the most beautiful woman I had ever met, had a very strong instinct that she would be important to my future, and that I cared about her and was interested in pursuing a relationship with her. ▆▆▆▆



The date ended amicably with a hug around 5am, with the sun coming up, and I took an Uber back to my apartment and went to sleep.

22. On information and belief, ▆▆▆▆ "broke character" on January 25 ▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Since she believed I would not be terminated, she could behave normally around me and cease trying to manufacture a false sexual harassment complaint.

23. In November or December, 2019, the firm published its 2020 billing rates for associates. On information and belief, my billable rate was set at ▓▓▓▓ which was in the range of billable rates for a third-year associate.

24. On the night of January 25 and the morning of January 26, ▓▓▓ and I discussed my billable rate, and whether the firm would re-class me as a mid-level associate based on my performance. She remarked that she "hoped they would--" and her eyes trailed off. During the date, ▓▓▓▓▓▓▓▓▓ On information and belief, ▓▓▓▓ reticence was derived from uncertainty around whether or not she would ultimately need to file the false accusation against me, therefore making us de facto enemies.

25. On Monday, January 27, I observed that ▓▓▓▓ had removed the picture of the ▓▓▓▓ family from her wall.

26. On information and belief, the picture was designed to create a basis to explain to me ▓▓▓▓ eventually taking my job (for example, ▓▓▓▓ might say that she had a certain amount of credible altruism toward ▓▓▓▓ people that predated my employment, etc.).

27. On information and belief ▓▓▓▓ communicated with ▓▓▓▓ about the date on Sunday, January 26, and at that point they felt comfortable that they had a factual basis to ultimately fire me if they eventually needed to, and therefore the picture was no longer needed.

28. During the week of January 27, ▓▓▓▓ and I texted on multiple occasions and flirted off hours. (I do not presently have these text messages but I am paying a data recovery consultant to recover them from my device. The EEOC may consider subpoenaing T-Mobile for logs of the text messages.) One conversation I recall was over her complaint that there was not any iMessage "emoji" reflecting her particular skin tone, and she complained that Apple probably left out her skin tone because ▓▓▓▓ women are marginalized globally. I told her that she was beautiful and should never feel less than others because she is an ▓▓▓▓ woman, and we joked that we should file a lawsuit against Apple together on her behalf.

29. On Friday, January 31, 2020, there was a happy hour for a departing associate at a local bar called the Spectra Wired Café. At the happy hour, ▓▓▓▓ displayed odd or standoffish behavior, and I kept my distance from her and only spoke with her very briefly before she left. I wished her well and told her to drive safely to her destination.

30. On information and belief, ▓▓▓▓ was "in character" on the night of January 31, 2020.

31. At the January 31 happy hour, it seemed as though there was a joke of some sort that I was not in on involving me. I later commented in a text message to an associate named ▓▓▓▓ that I sensed something was off. During the evening, an associate named ▓▓▓▓ asked me whether I owned a firearm, and I said I did not.

32. Later that evening I texted ▓▓▓▓ to see if she got to her destination safely, as she had been drinking and the roads were slick. She told me she had but that she was "starting to find this attention uncomfortable." I replied that I had a girlfriend.

33. On December 9, 2021, while on a paid leave of absence, I inquired with an employee named ▓▓▓▓▓▓▓▓▓▓▓▓ leasing office, the management company

- 8 -

of the former Spectra Wired Café, and she told me that she would contact someone at Trio Properties, LLC, the management company of "The Place 2 Be" (the bar that now exists at the location of Spectra Wired Cafe, which closed in February 2020) to see whether they possessed physical CCTV tapes of the happy hour. She later responded and said that the holding period for those tapes is only two weeks, and that none were available of the night of January 31, 2020.

34. After that evening, I texted ▮▮▮▮ on February 9, March 2-3 (I had caught coronavirus and asking her to help me acquire hydroxychloroquine from ▮▮▮▮ April 4, and April 5, and she did not respond, but otherwise did not speak with her.

35. In the wake of the horrendous and despicable killing of George Floyd, there was a firm-sponsored virtual moment of silence which I attended.

36. In the summer of 2020 there was a mandatory training on racism which I did not attend. I had been reading about critical race theory and believed that it was Marxist indoctrination, and I heard that many companies were doing this same thing. I heard also that some individuals were meeting in clandestine offsite meetings to coordinate a kind of strategy around diversity designed to secure democrat political objectives.

37. On information and belief, Leander Dolphin took a sabbatical during the early summer months of 2020, wherein she attended Antifa planning exercises and conferences.

38. In the summer of 2020, I was assigned several highly difficult tax assignments which well exceeded the duties of a first-year associate, which I initially viewed positively as "stretch" assignments but ultimately grew to believe were assigned to cause me to struggle and ultimately form a basis to performance-terminate me (e.g., pretext for my discriminatory termination).

39. One of the assignments was effectively an "impossible task" involving an IRC section 409A failure in a profits interest plan, which itself failed to comply with the applicable profits interest exemption. For complex reasons, this creates a major tax problem, one that the IRS has never really said how to fix, and I ultimately used a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to achieve the client's objectives. It was an extremely difficult assignment for a junior associate and in most law firms, the assignment would have been taken by a senior partner. I requested help with it multiple times and spent a good amount of time on it but no one else knew how to fix the problem or could or would help me. I completed the assignment in late August or September 2020, and on information and belief, my response to the "impossible task" was so good that I could not credibly be performance terminated.

40. In July, 2020 I asked my manager ▮▮▮▮▮▮▮ whether the assignments were to create a basis to fire me. He said no, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, showing me that something was amiss. ▮▮▮▮ is a good person who I believe legitimately tried to help me by letting me "interview" for the available "white male" spot later taken by ▮▮▮▮ On information and belief, his hands were effectively tied by Dolphin's policies and the Mansfield Rule, and this was the best he could do.

41. During June, 2020, the firm, acting via ▮▮▮▮▮▮▮ decided that it had a positional conflict and could not take a plaintiff-sided employment case which I had been developing for the past several months against a company called ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ for, inter alia, alleged violations of the Employee Retirement Income Security Act of 1974 ("ERISA").

42. In a meeting on January 27, 2020 with █████████████████████my supervisors in the ███████matter, I communicated my strong opinion that the firm had an insurmountable positional conflict and that it should not proceed with developing the case.

43. In the January 27 meeting, my concerns were dismissed and I was directed to continue billing hours on the ████████matter.

44. On information and belief, the firm knew all along that it would not take the ██████ matter.

45. On information and belief, I was assigned the ████████matter to artificially decrease and deflate my billable utilization rate (hours collected/hours billed), to support a case for my ultimate termination.

46. On information and belief, the ████████matter was also designed to provide me with experience for which to use when I ultimately "just wasn't good enough for large firm practice" and had to take a step down back into plaintiff-side employment firms.

47. During summer, 2020 I received several highly complex partnership tax assignments and stopped working on employee benefit assignments almost entirely.

48. On information and belief, I was interviewing for the only "open" position in the tax department for a white male, which was later filled by a partner named ██████████ who had been a senior associate at the firm, left in November 2019, and then returned after I was terminated in February or March 2021. In other words, on information and belief, ████████ a white male, was pushed out because of me, and then ultimately I was pushed out because I could not do his job, because I did not have partner-level expertise in partnership tax. I was paid and classed as a first-year associate at all relevant times.

49. The reason for this shuffling of white males is the operation of a thing called the "Mansfield Rule". The firm is certified for the highest available Mansfield designation, which requires, on information and belief, at least 30% of billable work in each department go to women or persons of color. As the firm planned to hire, on information and belief, another white male ████████████into the Tax Department starting January 4, 2021, and intended to rehire ████████, there was not enough headcount in the tax department to support my continued employment, because there was only one diverse associate. Similarly, even though I was the only employee benefits associate, I could do only at most 70% of the employee benefits work, requiring there to be another associate trained and working on employee benefit matters.

50. On information and belief, the diverse associate doing employee benefits work was, at all relevant times, ████████

51. On information and belief, the firm had been staffing ██████on employee benefits assignments starting in the summer of 2020, around the time I began being rotated into strictly federal tax and executive compensation work.

52. On information and belief, the firm needed to move ██████out of the ████████████ group because, inter alia, two of the incoming diverse first year associates █████████████████████ needed to be staffed in the ██████ department. The ██████████department is able to absorb the diverse associates because the nature of the work is mostly ████████████████suitable for an

inexperienced associate, █████████████████████████████

53. On information and belief, the █████████ group could absorb only two diverse associates, meaning that ██████ needed to be transferred out of it.

54. On information and belief, because of what happened to me, the firm may be utilizing pass-through billing arrangements to conceal the actual associates doing work.

55. On information and belief, ████████ was the only diverse associate that could have been doing employee benefits work for purposes of the Mansfield Certification in the time after ████████████ a diverse tax associate, left the firm in or around March, 2021.

56. On information and belief, █████ ceased doing employee benefits work on or around September, 2021, providing her with effectively a one-year rotation into the department.

57. On information and belief, employee benefits work is now performed by a ████ ██████████████████, women who qualify as diverse for purposes of the Mansfield Rule.

58. On information and belief, the firm concealed the placement of first year associates starting in January 2021, for the first time ever, such that first year associates were allegedly not assigned to particular departments until early summer, 2021.

59. On information and belief, the intent of this deferred placement of first-year associates was to provide the firm with a basis to claim that they lacked knowledge of where the associates were going to be placed as early as summer, 2020.

60. On August 3, 2020, I sent ███████ text message which read as follows: "Want to Caddy for me one night this week at Goodwin Park?" Goodwin Park is a municipal golf course in south Hartford which I had been playing nine holes at twice a week starting in August, 2020, to relieve pandemic-related stress and burnout from never leaving my apartment. Golf was the only available "normal" activity at that time. Goodwin Park has many herds of deer that live on the course, which have become desensitized to, and are not afraid of humans. I wanted █████ to see the deer, thinking this would amuse her and make her happy. She did not respond to my text.

61. On or around August 24, 2020, I received an assignment to speak with a vendor who was selling a transaction document management software. I did not handle closing documents in transactions and found the request to be odd. The vendor requested, in a call on August 26, 2020, that I contact two junior associates by email who might be interested in learning more about the service. I asked the vendor which Shipman partner gave him this assignment for me to complete, and he said ████████████ I found the vendor's request to be exceedingly odd and did not comply.

62. On information and belief, the intent of this vendor outreach was for me to contact ████████ who I knew handled closing documentation, posing as her supervisor, and thus making it look on paper that I was her supervisor, prior to her making the sexual harassment accusation the following week.

63. On Thursday, August 27, 2020 there was a mandatory session on diversity hiring which I did not attend. The meeting was styled as an adhesion contract, meaning if you attend you consent to the the following statement (which I wholeheartedly support in principle, but I also understood it would mean that I would lose my job), which came from an associate who is openly communist and whose partner teaches Marxist political theory at a local university, the invitation for which stated that:

- 11 -

. . . we are concerned about the negative impact and long-term consequences to this organization and its employees due to the lack of Black peers and their perspectives. We also lament what this might say about the broader lack of opportunities in private practice for fellow young members of the bar who are Black. . . . we are committed to the following goals: 1) learning more about the firm's existing processes and structures that assess and affect diversity, inclusion, equity and representation at the firm; 2) engaging our peers in candid discussions about these issues, 3) sharing our collective observations and recommendations to the firm; and 4) leveraging our own networks to recruit and retain Black talent and to increase diversity and inclusivity across our offices.

64. I did not attend because I do not believe in principle that race is an appropriate consideration in any employment decision, whether for good or bad, and I understand it to be the mission of this agency to enforce this principle. I also knew that anything I said in that meeting (such as disagreeing with the above) can and would be used against me and could harm my reputation at the firm. Lastly, I understood that attending the meeting would be consenting to my own unlawful termination.

65. On Saturday, August 29, 2020, a partner at Shipman & Goodwin LLP by the name of Dan Schwartz sent an email to all associates soliciting anonymous complaints of sexual harassment and advising associates that sexual harassment is a disbarrable offense under the ethics rules of the State of Connecticut, Rule 8.3, Misconduct, which the firm had helped to develop.

66. On or around September 1, 2020, ▊▊▊ filed her sexual harassment complaint with firm's Chief Talent Officer, Christina Hermann. ▊▊▊ presented the text messages commencing on January 31, 2020, but none before, and claimed that my request to walk a public golf course with her made her feel "afraid for her personal safety because she was living alone."

67. In making her complaint, ▊▊▊ painted me as a dangerous, violent individual who she believed would physically harm or even rape her. ▊▊▊ did not mention anything about the date we went on January 25-26, 2020, and did not present any text messages from the period January 26 - 31, which would have conclusively disproven, discredited and made it impossible for her to claim that I was a dangerous person. I would never hurt ▊▊▊ period, and I have never been nicer or more respectful and careful with any woman in my entire life.

68. On information and belief, ▊▊▊ acted under the direction of the firm's senior management in making her complaint.

69. On information and belief, ▊▊▊ was pressured to do what she did as a term or condition of employment.

70. On information and belief, ▊▊▊ is not a bad or unethical person.

71. On information and belief, ▊▊▊ is just as much a victim of Leander Dolphin as I am.

72. On the evening of September 1, 2020, I received an email from the Firm's Chief Talent Officer requesting that I attend a teleconference at 9am the following morning.

73. In the 9am teleconference on September 2, 2020, the firm's Chief Talent Officer, Christina Hermann, investigated ▊▊▊ complaint. I told Hermann about the date, and Hermann remarked that this was news to her, and that, as a result, "I did nothing

- 12 -

wrong." Hermann and I discussed ████████ mental condition and concluded that, given the flippancy and aggression she displayed in making this kind of serious accusation without warning and with lies, that if I contact her again she might complain again. Hermann recommended that, given this, I not contact her again, and told me that I would suffer no penalty as a result of the accusation. I told Hermann that I harbored no ill will against ██████

74. Although I was cleared of the offense, the Firm made no written record of the complaint and my being cleared of it in full.

75. In an email on November 4, 2020 and on the call we had on November 11, 2020, Hermann told me that she did not even believe it was a valid complaint that needed to be documented. Despite this, the firm later changed position and concluded that it was a valid complaint under the firm's sexual harassment policy, and that I violated the retaliation component of that policy.

76. It was discriminatory for the firm to change position on whether the original complaint fell within the ambit of the firm's sexual harassment policy.

77. If the firm had investigated the original complaint properly as within the firm's sexual harassment policy in September, 2020, I would have been cleared of all charges, would never have been placed on a paid leave of absence, and no false rumors could have illicitly spread about me.

78. The firm's "whipsaw" enforcement of the sexual harassment policy caused me to have to contact ██████ to resolve the matter, which action was authorized by Hermann and then later was used as a basis for my termination for cause ("entrapment").

79. On information and belief, Schwartz's August 29 email was designed to make it appear as though the firm learned of the sexual harassment accusation by accident or coincidence on August 29, to conceal the fact that ██████ acted under the direction of the firm's management in filing her false claim.

80. On information and belief, the firm intended to terminate me on the basis of the false accusation and formed this intent before the complaint was even investigated. The anonymous solicitation of harassment complaints was designed to make it appear to the other employees that, when I was ultimately fired, this is the coincidental means by which the firm learned of it.

81. In the subsequent months, I was treated like a dangerous villain by all employees of Shipman & Goodwin. I was isolated from associate affairs, pulled off of deal teams, given insular and short-term assignments (leading me to believe my employment would conclude around the end of the year) and given bizarrely junior work. The idea seemed to be to prevent me from continuing to impress others with my work, and to create a narrative within the firm that there was a performance or character-related issue with me, to pre-empt my ultimate termination.

82. In September, 2020, I received a "cold call" from a potential client, who left a message with the receptionist, ██████████ for me to call her back. When I called back, the caller told me that it was "so *weird*" that I knew her last name, and abruptly declined my legal services.

83. On information and belief, this call was not a cold call, and was designed to create another lie or basis for a lie about my professional character, as part of an ultimate effort to terminate me for cause and disbar me.

84. In October, 2020, I was asked to provide legal research assistance with a project regarding ███████████████ On information and belief, the intent of this assignment was to create another factual basis to lie about my professional character. For example, the partners that coordinated the project could later lie and say that I said something off-color or questionable during the assignment.

85. In September, 2020 the firm held a series of virtual zoom meetings among associates designed to get us to talk about our isolation during the pandemic, and how things were going with our mental health and well-being in general. There were four time slots. I observed that, when I joined a given meeting, an attorney named ███████ ████████████████████████ would change her group to mine. On information and belief, the intent of this was to create another factual basis for someone to later claim that I said something off color about ██████ Because of this, I ultimately did not attend any of these meetings.

86. In October, there was a series of happy hours designed to introduce us to the incoming associate class, and I was invited to one that only had some, but not all, of the incoming class. On information and belief, the intent of this meeting was to conceal my knowledge of the incoming tax associate ███████████ Although █████████ current firm bio states that he is in the █████████████████ attended the ██████████████████████, where one of the tax partners went, participated successfully in an █████████████ and performed tax work as a summer associate at the firm.

87. In September, 2020 I received an invitation to join an app called "Fishbowl", which is a social networking app designed to connect law firm associates across firms. The invitation emanated from the firm's recruiting director, █████████████ made my firm name "E. Goodwin & Sons" rather than "Shipman & Goodwin" as a means of singling me out publicly as different from the other associates at Shipman, and making me feel different from them (e.g., to make me feel and look like a vicious gentile beast and sexual harasser).

88. The day before my performance appraisal on September 30, 2020, I received an invitation to meet for drinks with ████████████████. On information and belief, the intent of this meeting was to create another factual basis for which to lie and claim I made an off color remark about ██████ During our conversation, which proceeded very amicably, we did not discuss ██████ whatsoever.

89. On September 30, 2020, I had a "mid-year" performance review for the period ended September 30, 2020, but for which only formally covered performance through the beginning of the summer. I received an overall strong review ███████████ ████████████████

90. On information and belief, other associates such as ██████ received their "mid-year" performance review in June, 2020.

91. On information and belief, the intent of "deferring" my performance review was to see if I would make any mistakes over the summer for which the firm could begin to create a pretextual case around negative performance. To their chagrin, I exhibited superhuman legal ability and never gave them this basis.

92. On information and belief, the firm's year-end performance review was for the period 9/30 – 11/30/2021. During this period I received bizarrely junior and insular

- 14 -

assignments, and went for long stretches of time without being contacted by my supervisors.

93. On information and belief, the firm intended to manufacture a case to performance terminate me on the basis of this artificially truncated and bizarre two-month year-end review period.

94. On information and belief, the firm has not utilized a two-month year-end review period in other years.

95. On information and belief, my supervisors knew that I would be terminated and were looking for any pretextual reason, including manufacturing a bad or unimpressive performance review during this truncated review period.

96. On information and belief, this discriminatory desire to terminate me was the reason for my being ultimately placed on a paid leave of absence, and tortured overall in the various ways I was, despite all involved knowing I did nothing wrong whatsoever and was a strong performer.

97. On information and belief, ▇▇▇▇ spread the same lie she had told HR about me widely throughout the firm, again in an attempt to pre-empt and "soften" perception around my termination within the firm's associate population, where I was well-liked.

98. By November, 2020, I realized that I needed to get the rumors to stop and contacted Hermann on November 2, 2020 to request a conference with ▇▇▇▇ and requested a legal hold on relevant records to a potential employment discrimination case.

99. Had the firm properly investigated and papered the original September complaint, I would never have had to contact ▇▇▇▇.

100. Hermann confirmed my request for the conference on November 4, 2020.

101. On November 5, 2020, the day after I requested the conference, I received a strange voicemail in my inbox. My phone did not ring and the call did not appear on my call log. That same day, on a taped call, I inquired with the IT help desk as to whether this was even possible, and the help desk advised that a genuine external call would have appeared on my call log, and that it could be inferred that the voicemail must have emanated from a number or account within the law firm.

102. In the November 5 voicemail, the caller, named ▇▇▇▇ requested my assistance with an international property transaction involving the intestate distribution of property and securities from an account or accounts in ▇▇▇ to a domestic (US) LLC. The caller suggested that she was looking for someone familiar with ▇▇▇ law and that was a ▇▇▇ speaker. ▇▇▇ is and was the only person that fit that criterion within the law firm.

103. That same day, ▇▇▇▇ circulated a new client email, wherein the firm had been engaged to perform 401(k) services for an ▇▇▇▇▇▇▇▇

104. The same day, ▇▇▇▇ circulated a new client email, wherein the firm had been engaged to provide tax services to ▇▇▇▇ a ▇▇▇▇ company in Latham, NY.

105. I had interviewed and been offered a job as in-house tax and employee benefits counsel at ▇▇▇ September, 2016.

106. On information and belief, the LLC designated to receive the property and securities for ▇▇▇▇ was called ▇▇▇▇▇▇▇ (CT Bus. ID # ▇▇▇▇▇▇

107. On information and belief, ███ contributed the bequested property to, or is managed by, an asset advisor called ███

108. On information and belief, ███ or its principal, ███, is a client of Shipman & Goodwin LLP.

109. On information and belief, ███ is a client of one of the partners that managed ███

110. On information and belief, the call from ███ was not a true "cold call," and the intent of the assignment was for me to contact ███ in a managerial capacity, to establish either a quid pro quo (an exchange of an economic benefit—the client matter—for the requested conference) or a supervisory relationship for purposes of the sexual harassment law in advance of the requested conference with her.

111. Establishing either a quid pro quo or supervisory relationship would have charged any further interaction I had with ███ as a potential grounds for sexual harassment, and ergo, my disbarment.

112. On information and belief, the firm illicitly attempted to frame me for an offense for which the penalty was disbarment.

113. On information and belief, the firm did so with actual malice and racial animus.

114. On November 5, 2020 I informed Hermann that, because of the strange voicemail and now generally mistrusting Hermann's motives, I did not wish to have the conference with ███

115. On November 6, 2020 I sent ███ three text messages. The intent of the text messages was to test ███ state of mind as I was legitimately confused about why she had falsely accused me and was now spreading rumors. It seemed equally likely to me that she was just a hurt girl who was mad at me for some unknown reason, rather than a monster executing me with the false accusation. I cared about her and wanted to believe she was doing what she was doing out of a human motive. This is a recurring theme – I always give her the benefit of the doubt because I really did and do care about her. I asked her to please contact HR to clear my name in writing knowing that, so long as there was a writing the rumors would have to stop. ███ did not respond.

116. On November 8, 2020, I inquired with Hermann about whether she had heard from ███ regarding the text messages. Hermann told me that ███ had not contacted her, and Hermann requested that we have a conference on Monday, November 9, which I accepted.

117. In a teleconference on November 9, 2020, I told Hermann about my plan to contact ███ again if I did not hear back from her, or if she did not contact Hermann, shortly. I told Hermann that I intended to have the firm investigate why ███ was doing what she was doing, if ███ did not otherwise drop the false complaint and the false rumors.

118. On November 10, 2020, I sent ███ another string of text messages and sent her an affidavit detailing our friendship. The intent of the affidavit was to effectively serve as a legal cease and desist letter, to get ███ to understand she was defaming my character, that a potentially extremely serious and costly legal matter was

- 16 -

developing, and to please stop. I did not want to be in a no-holds-barred fight with ███ because I like her. ███ did not respond.

119. I had no intent for ███ to sign the affidavit and knew she clearly would not.

120. I treat ███ as my equal and as a fellow lawyer and always have. In my opinion she should have known better than to be going around lying about me, it was wrong, and she was engaging in serious misconduct that could result in serious legal, ethics and reputational consequences for her.

121. The affidavit was sent in an email attachment on the firm's computer systems and was a 48kb adobe pdf document titled "affidavit".

122. The affidavit was password protected to prevent ███ legal practice assistant, or anyone else, from learning about the details of our friendship and our date unless she wanted them to. The intent of password protecting the document was to protect ███ privacy.

123. The password for the affidavit was "t1ckt0ck" to suggest that an investigation of her actions would commence if she did not respond within 24 hours. It was later claimed that this password was a reference to a "bomb" that would explode her computer. This is a preposterous and laughable claim, and I would be curious to see whether a 48kb pdf could explode any computer.

124. It is well known that I am not technologically savvy and have no advanced knowledge of coding or computing, and ███ knew this directly. For example, in a meeting with the Firm's Chief Technology Officer, Joe Ficocello, in (on information and belief) October 2020, I complained that I hated technology and didn't know anything about it.

125. On November 10 and November 11, 2020, I spent around 4 hours drafting a release agreement, requested consideration of $1, releasing ███ from all defamation claims in exchange for her circulating an apology email throughout the firm, which I also drafted, along with a proposed distribution list.

126. These documents are saved to the "P" or "personal" drive of my firm laptop or, if they are not saved, are recoverable from temporary files.

127. The firm prevented me from downloading these documents and refused to provide them to me as a piece of evidence during the subsequent employment investigation.

128. I was shut out from accessing the firm's computer systems and barred from contacting ███ on penalty of termination before I was ever able to present her with either the formal cease and desist letter, the release or the draft of the apology email.

129. Defending oneself from false claims is a first amendment right.

130. The firm violated Connecticut law by infringing on my first amendment rights.

131. The firm violated my rights because CRT says I have no rights because I am an oppressor.

132. The firm treated me differentially with respect to other employees being investigated in the past for sexual harassment, because I am a gentile and the subject individual in the past cases (on information and belief, ███ was not. Moreover, on information and belief, Dolphin was not involved with the handling of ███ issues, and his matter predates the Mansfield Rule.

133. On November 11, 2020, Hermann contacted me, saying ███ had come to HR with the text messages, was scared, and accordingly put me on a paid leave of absence. In the firm's January 26, 2021 termination report, it was claimed, although

- 17 -

not on November 11, 2020 that ████ perceived the affidavit as a kind of electronic self-destruct device that would explode her computer. On this basis (an electronic threat) the firm put me on the paid leave of absence.

134. On the November 11 call, Hermann intentionally was evasive when I inquired about the manner in which ████ felt threatened by the affidavit, suggesting that the firm had not yet reached a defensible legal conclusion about how to describe the alleged "threat".

135. On information and belief, the firm used this false and disingenuous claim of a threat to place me on a paid leave of absence.

136. On information and belief, the firm placed me on a paid leave of absence to bias opinion within the law firm about my actions and because of my race.

137. Other associates could easily have learned about me being placed on a paid leave of absence because any email sent to me would have returned with a bounce that stated "Joe Indelicato is on vacation. If you need assistance, please contact ████ ████████████████ ", and which specified no return date from the "vacation." This clearly suggested that the message was not written by me.

138. On November 11, 2020, a partner at the firm (and its "ombuds") named ████ ████ circulated an email to all associates soliciting legal research assistance with helping victims of domestic abuse defend themselves from motions to quash temporary restraining orders (TROs).

139. On information and belief, the intent of ████ email was to collect a group of associates who would aid ████, who was likely painted as a damsel in distress considering filing a TRO against the dangerous gentile beast Joe Indelicato.

140. On information and belief, the intent of ████ email was to defame me within the law firm and preempt my ultimate, unavoidable termination.

141. On information and belief, the firm used this false electronic threat as a means to commence electronic surveillance on me.

142. On information and belief, the firm hired a private investigator named ████ ████ a former FBI agent, to surveil me commencing on or around June 2020.

143. On information and belief, ████ continues to surveil me.

144. In June, 2020, Dan Schwartz asked me to join the board of directors of the ████████████████ I was told that the firm's then-Managing Partner ████ ████████████ requested that I join the Board ████████████.

145. On information and belief, the firm requested that I join the ████████████████ as a means of painting me as a "creep" both within the firm and externally.

146. In September, 2020, ████████████, the Client Relations Manager for the tax department, insisted that this Board membership be placed in my firm biography.

147. On information and belief, the firm intended to use my membership on this Board to create a false basis to electronically surveil me in some manner, through ████ or by other means.

148. On information and belief, the firm filed an "incident report" with the Cybersecurity, Infrastructure and Security Administration (CISA) as a result of the November 11, 2020 "electronic threat."

149. On information and belief, I have been placed on a list of "threats" maintained by CISA and a public-private FBI partnership organization called "Infragard."

150. On information and belief, some Infragard members are Antifa operatives.

- 18 -

151.    On information and belief, I have been blacklisted nationwide through Infragard.

152.    On November 11, I received for the first time an email solicitation from an email chain maintained by attorneys at the law firm █████████████████ distributed to employee benefits associates at large law firms nationwide, for which actively recruited employee benefits associate positions are posted ████████████ Email Chain").

153.    On November 11, my Shipman email account was placed in the "To" group of the Ropes & Gray Email Chain.

154.    Accordingly, any large law firm hiring an employee benefits associate would learn that I was on a paid leave of absence, or that there was some other kind of serious issue with my employment at Shipman, by receiving the bounce received from my Shipman email address.

155.    By this mechanism, Shipman defamed me and began "blacklisting" me as of November 11, 2020, to prevent me from ever working in the industry again. These efforts have continued unabated through the present day.

156.    The investigation commenced on November 11, which was "on the record", and I recorded the call with Hermann, along with all the other interviews during the investigation.

157.    The second investigatory interview was on November 16, 2020. The investigators at this time were Hermann and Anne Littlefield, the firm's general counsel. There is a recording of this interview which was "on the record."

158.    Following the second investigatory interview, the firm presented me with an offer to extend my health benefits for three months in exchange for a full release of claims and my resignation. No severance consideration was offered. Knowing I had done nothing wrong, I declined this offer and requested a full investigation.

159.    The third "on the record" investigatory interview was on November 30, 2020. The lead investigator was changed to Leander Dolphin, with Anne Littlefield remaining as second chair investigator. There is a recording of this interview.

160.    On or around December 12, 2020, the firm posted my position, mid-level employee benefits associate, on its "careers/open positions" portion of the website, shipmangoodwin.com.

161.    On or around December 12, 2020, the firm appeared to hire a retired partner named ████████████ to do miscellaneous health and welfare benefit matters.

162.    During my employment at the firm, I rarely if ever performed health and welfare benefit work.

163.    On information and belief, ██████ bills were funneled through █████ so as to conceal the fact that █████ was doing this work. In other words, █████ never returned to the firm, and was merely used as a billing entity/placeholder for ████████ employee benefit-related bills during the pendency of the employment investigation.

164.    During the period November 30 – December 31, 2020, I sent the firm a litany of emails. None of these emails were responded to in any respect, and the firm later claimed (on January 4 and 5, 2021) that it never received any of these emails.

165.    The emails requested information about what I was even being investigated about, requested that I be provided the ability to discover evidence from my firm-provided computer or the firm's email systems, requested information about my procedural rights during the investigation, requested information about the scope of the

- 19 -

investigation and what evidence the firm possessed, and what the status of the investigation was.

166. I received no responses to any of my email inquiries.

167. I received no "Mailer Daemon" bounce back from the firm with respect to any of the emails I sent, suggesting that they were received, contrary to the firm's claims.

168. On December 15, 2020, I received a litigation hold notice from ███████ associate general counsel, suggesting a termination decision had been made.

169. On December 31, 2020, the firm emailed me requesting a conference on January 4, 2021.

170. On December 31, 2020, the Firm did not deposit my final 2020 paycheck by direct deposit.

171. On or around December 31, 2020, Hermann resigned from Shipman.

172. Reading the failure to deposit the check in conjunction with the firm's deadpan request on News Years Eve to meet with me on January 4, my knowledge of the start date of the new first-year associate class, along with the fact that the firm had not responded to any of my emails and had posted my job to its website, I viewed this as a credible indicator that I was to be imminently terminated.

173. I understood the purpose of the January 4 meeting was to terminate me verbally, without putting any of the firm's findings in writing to be challenged. Accordingly, I did not respond to the firm's inquiry, forcing them to email me with the preliminary findings.

174. On January 4, 2021, five or six new first-year associates started at the firm.

175. On January 4, 2021, in response to my ignoring the firm's request, the firm sent me an email summary of its preliminary investigation findings and threatening to terminate me if I did not respond.

176. The January 4, 2021 preliminary investigatory findings falsely claimed that I attempted to "threaten" ████ with my affidavit.

177. The January 4, 2021 preliminary investigatory findings falsely claimed that I had been barred from contacting ████ on the September 2, 2020 call, and that Hermann had not authorized me to contact ████ on November 8-9.

178. Hermann did authorize me to contact ████ and the undisputed email communications between November 3 – 10 clearly bear that out. I told Hermann point blank in an email on November 8 what I was doing, and explained it to her in detail the next day on our November 9 call.

179. Hermann told me point blank in an email on November 3, and on the November 11 call, that she did not view ████ September complaint as a valid sexual harassment complaint within the meaning of firm policy HR-013, and therefore had never made a written record of the investigation findings.

180. Shipman policy HR-013 states, in relevant part:
   F. Retaliation Prohibited. Retaliation against any individual for complaining *in good faith* about alleged discriminatory acts and/or harassment, or participating in any investigation of same, is prohibited. Good faith claims of retaliation may be reported and will be investigated as provided in Section D of this Policy. (emphasis added).

181. It was discriminatory for the firm to enforce Policy HR-013 against me with respect to the September complaint in November but not September. If the firm had

conducted a full investigation in September, I would never have had to "retaliate" against ███████

182. To the extent Hermann had an issue with me contacting ███████ she should have said that on our November 9 call and memorialized that clearly in an email. By consenting, Hermann effectively "entrapped" me into contacting ███████, which she knew for a fact I would do because I explicitly told her, both in writing and verbally, that I was going to contact her.

183. Hermann knew for a fact that I was falsely accused of sexual harassment and that the original complaint was not filed in good faith, and evidently failed to report these clear and undisputed facts to the firm. For example, consider this exchange from the undisputed recording of the November 11 interview (Hermann is "CTO"):

JJI:      [CTO] don't you think that it's a little unfair though that someone can make up lies about you that could have ruined your life, and then that person can't even be angry with you, I mean that's how...that's the level of double standard that is out there?

CTO:    And so again you're calling it a lie, she represented it as her version of events and her interpretation. You guys basically said the same thing except for the fact that she did not tell me—and that's true—about the date.

JJI:      But that's the main fact...that's the most important fact.  So that's a gross misrepresentation.

CTO:    So that's an omission, that's an omission—

JJI:      A gross one!  A gross one.

CTO:    It wasn't a commission, I mean she didn't come out and lie about it, she just didn't tell me.

JJI:      Well let me just ask you in passing, you were dating at one point and I know you are married now, but have you ever gone on a really good date and been up until 4, 5 in the morning talking to somebody in an intimate conversation?  I mean, romantic feelings are going to arise from there because it is clear that they exist. So the fact that she did not mention that is...I mean, how could you ever explain that?  How could you ever—

CTO:    It's a major omission, I will grant you that. Absolutely. I did not know that. I didn't know that when I talked to her, but I did know it after I talked to you. She confirmed it after I went back to her, but she denied that it was a date. She says that it was just, uh, I can't remember what she said. But she didn't...she didn't characterize it as a date. She didn't deny it, she said "oh...yes, that happened" but that it wasn't a date.

JJI:      I mean, I don't think that that matters, it is what it is. But--

CTO:    Right.

JJI:      But so [CTO] I have been so patient with a person who came to you and said "this guy won't stop - and, he is a menace - and, he is making me feel 'uncomfortable.'" And she didn't – and which really with respect to – I sent one text message in the course of what, four or five months? One text message, that's it. And she's going to come to you a month after I send one text message in four or five months and then leave that out? I mean, that is...that's pretty serious and, you know, I didn't ever...I mean I didn't fly off the handle. On that day [September 3] I could have called her and said "what the hell are you doing, ███████ What the f-? What is wrong with you?" And I could have come down on her. It's only now after I'm, you know, just at this process where it's like, "okay I want this to be resolved, it's really not hard, ███████please just say that I did not sexually

harass you. We don't have to ever talk again, I don't care. I just want to know that you are not a threat to me." I'm the victim here, and I'm being put on a leave of absence?

184.   It was discriminatory for the firm to conclude without explanation that a complaint filed with gross omissions of the most legally significant facts is a complaint filed "in good faith" within the meaning of Firm Policy HR-013. It clearly was not filed in good faith and was clearly designed to cause my termination for cause and/or disbarment from the legal profession.

185.   As I argued in my January 8 rebuttal, every available legal definition of "good faith" excludes lies and gross omissions, particularly intentional and malicious ones.

186.   The firm never provided me with an opportunity to discover that it had some, but not all of the text message communications between myself and ███████ until October, 2021. That delay was not only retaliatory against me for (I guess) still trying to continue my legal practice and regaining employment, but was also clearly designed to prejudice my ability to file this complaint (particularly when viewed in light of the fact that the firm also attempted to have me thrown in jail on October 18, 2021, the same day I received the text messages) given the SOL running on November 22, 2021.

187.   The firm abused the timing of Hermann and ██████ resignations to manufacture a disingenuous and false scenario where it "never had the power" to discover that my side of the story was clearly correct. For example, the firm "never had the power" to compel ██████ to produce the other text messages, because by the time I learned they were working with a defamatory and incomplete sampling, ██████ had already resigned. Similarly, Hermann had resigned by the time I received the preliminary investigation findings on January 4, which disregard clear and apparent evidence and knowledge indisputably possessed by Hermann. As set out in my January 8 rebuttal, and subsequent communications to the firm, the January 4 and January 26 findings disregard clear and undisputed email evidence and audio evidence.

188.   On information and belief, ██████ Hermann and Dolphin are members of Antifa.

189.   On information and belief, ██████ Hermann and Dolphin, along with ████████ and other members of the management committee at the relevant times, coordinated over the course of several months to execute my unlawful termination, completely without provocation or reason other than to punish me for belonging to an apparently disfavored race.

190.   On information and belief, ██████ Hermann and Dolphin executed me by false cancellation because I failed to attend mandatory CRT indoctrination sessions, and because I failed to voluntarily consent to my own unlawful, discriminatory, and race-related termination. I was effectively presented with the choice to step down for no reason to clear space for black attorneys, or otherwise be brutally executed and disbarred by false cancellation.

191.   If the firm needed me to resign because I am white, then it should have provided me with time and an opportunity to find another position as it and all other organizations going through these types of race-related personnel changes (which I do not necessarily object to) have done. On information and belief, the firm has done this with all other white associates. For example, ████████████ resigned and went to ████████████████████████ ██████ resigned and went to ████████████ ██████████ resigned and went to ██████████

I am the only recent "alumnus" of Shipman that I am aware of that is not presently actively practicing law. The firm did this to me because I am a gentile, Aryan Oppressor beast and therefore deserving of violent liquidation. On information and belief, the firm finds my legal talent offensive given my racial characteristics and therefore has undertaken clear and indisputable efforts to end my life and career. The inference is that my differential treatment is the result of my "Oppressor" or "Aryan" status – to Shipman, my practice should not continue because I do not fit in with the Marxist program descending on private industry. In a communist revolution, the intelligentsia is always the first class to be eliminated, particularly within the learned professions.

192.    At all relevant times, the firm has known that I did nothing wrong, and has replaced my role with lesser attorneys who are not "Aryan" and who have less potential as a lawyer than i do. ("They hated me without reason.")

193.    On information and belief, the remaining members of Shipman's management committee were and have been aware that I was falsely accused, and intentionally disregarded clear evidence presented directly to them of same on multiple occasions both before and after my termination.

194.    The partnership and senior management at Shipman have discriminated against me on the basis of my race, religion, gender, and sexual orientation.

195.    I have been treated like a disgusting, vile, imbecilic gentile beast and shamed, defamed, disrespected, tortured, isolated, and destroyed by these evil, sick and malicious monsters.

196.    Considering all the evidence, the firm actually intended to cause my death, forcible confinement, or disbarment.

197.    The entire management committee, most likely the entire partnership of Shipman & Goodwin has engaged in stunning and disbarrable legal ethics violations and discrimination with respect to me, for no reason whatsoever.

198.    I have exercised superhuman efforts to resolve this legal dispute without controversy, and continuing steadily throughout all of 2021.

199.    On information and belief, the firm has failed to help me in any way so that I would be forced to "attack" the law firm or ▮▮▮▮▮ Upon my "attack", I would be painted as an aggressive, gentile, retaliator beast and double-cancelled for daring to dispute my own cancellation. This is a well-defined process, best described by Adolf Hitler in *Mein Kampf*, and as quoted in my attached article. This torturous treatment has caused me immense personal suffering and driven me to the brink of suicide, poverty, and despair, a process also described by Hitler.

200.    I have resisted all attempts to attack the law firm and ▮▮▮▮, and have shown ▮▮▮▮ in particular immense forgiveness, love and patience.

201.    On January 5, 2021, I had a call with Leander Dolphin and Anne Littlefield and requested the opportunity to rebut the firm's preliminary investigation findings.

202.    On the January 5 call, I confirmed that the call was "on the record" and for the first time, Dolphin objected to that request, despite misquoting my words on the November 30 call about a key investigatory finding. In other words, the firm could misquote me, but in Dolphin's mind, i had no power to "fact check" her defamatory quotations by recording the interviews. According to Dolphin, I have no civil or procedural rights in a life-or-death investigation.

203.    On the January 5 call, Dolphin made clear that although anything I say could be used against me, nothing she says could be used against her.

204.    I dispute Dolphin's position and recorded the January 5 call and all others.

205.    On January 5, 2021, Dolphin responded with her rules for the granted opportunity to rebut. I was given until noon on January 8, 2021 to file it, would have no opportunity to request additional evidence that I had not already printed out prior to being placed on leave, but was required to produce all evidence which I already had, and if I did not, this was an independent grounds for my termination.

206.    On the call of January 5, 2021, Dolphin first learned that I had contacted the EEOC regarding employment discrimination related to being placed on a leave, and the conduct of the investigation to date.

207.    On information and belief, this request that I produce all my evidence, while the firm did not produce any of its evidence (preventing me from learning they were working with an incomplete set of text messages all along) or otherwise respond to any of my other evidentiary or other requests, was flatly retaliatory, biased, and unlawful.

208.    The firm provided me with no opportunity to call witnesses in my favor or to publicize the matter whatsoever within the law firm. These efforts to "silence me" culminated with their attempt to have me thrown in jail and disbarred in October, 2021.

209.    Since my termination, no single employee of Shipman & Goodwin has contacted me or spoken with me in any respect other than Littlefield, who herself blocked me in August, 2021.

210.    The intent of Dolphin's January 5 request that I produce all evidence was merely for the firm to decide whether the evidence I then possessed would be enough for me to win a subsequent investigation on summary judgment. In other words, the firm openly and flatly telegraphed its intent to destroy and disregard any existing exonerating evidence that the firm had, but that I didn't already have. The request was intended to permit them an opportunity to evaluate whether they could "get away with" one of the most clearly wrongful, despicable, and racially malicious and brutal terminations in the history of American industry.

211.    Dolphin treated me this way because, according to her, I am Oppressor and have no legal or civil rights.

212.    Dolphin is a KKK-level racist, and her conduct throughout the investigation is effectively her telling me in so many ways that "my kind" isn't welcome at Shipman & Goodwin. It is something that would have happened to a black male in 1950s Alabama, and this kind of misconduct has no place in our society, ever.

213.    

214.    On January 5, 2021, Dolphin scheduled a preliminary termination meeting for January 11, 2021.

215.    On January 6, 2021, I requested, inter alia, all emails, call logs, etc. regarding ▮▮▮▮▮ alleged complaint that my November 10 affidavit was an electronic threat. I received no response

- 24 -

216. On January 8, 2021, I timely filed a rebuttal to the firm, attaching voluminous evidence, including recordings of, inter alia, all investigation interviews.

217. On January 10, 2021, Dolphin contacted me to reschedule the planned January 11 meeting to January 13.

218. On January 13, 2021, Dolphin indefinitely rescheduled the January 13 meeting.

219. On January 13, 2021, I requested copies of the firm's social media and electronic communications policies. I received a response on January 23 from Anne Littlefield.

220. On January 21, Dolphin scheduled a teleconference for January 26.

221. On January 21, I requested clarity as to whether the January 26 meeting was a meeting in conjunction with an ongoing investigation or a termination discussion, and received no response.

222. On January 23, I sent a letter to Dolphin requesting a response to my January 21 email and outlining the various procedural failures which had occurred in the investigation to date, including my inability to call witnesses and discover relevant information, in conjunction with the firm's repeated and continuous disregard of clearly relevant and indisputable exonerating evidence, and detailing instances of retaliation.

223. On January 25, I sent Dolphin another letter describing that I had not received a response to my January 23 letter in advance of the January 26 call, and informing Dolphin that I had just become aware that Hermann was no longer an employee of Shipman & Goodwin, and requesting a review of any evidence involving her, in particular given that she was not employed on or after my January 8 letter. I received no response.

224. On January 26, I accepted Anne Littlefield's call but informed Dolphin and Littlefield that I would await their report and decline any additional verbal discussion.

225. On the afternoon of January 26 I received the firm's investigation report and conclusions, which had clearly been prepared in advance of the requested January 26 teleconference. The report terminated my employment for cause.

226. The report concludes, among other things and without explanation, that I "retaliated" against ██████ within the meaning of Firm Policy HR-013, was insubordinate in violating Hermann's alleged bar on communications with ██████, and exhibited "poor judgement" during the course of the investigation.

227. The January 26 report disregards virtually all the evidence I mustered in the January 8 rebuttal, and is the product of knowing and willful negligence on the part of at the very least Hermann, who knew for a fact that I had been falsely accused, and thus could not have retaliated within the plain meaning of the policy.

228. Among other things, the January 26 report paints an intentionally defamatory picture of my moral and professional character, the nature of my interaction with ██████, and openly lies about the mechanics of the filing of her September complaint in an ill-conceived attempt to shield her from legal liability for her role in it. For example, although Hermann makes clear on the November 11 call that ██████ filed her complaint directly with Hermann, and provided information directly to Hermann, the report states that the complaint was funneled through ██████ supervisor, ██████, and that the conference after the September 2 call occurred with ██████ The intent of these defamatory lies is to conceal or isolate ██████ from legal liability.

229.    On information and belief, the lies in the report are evidence that the firm directed ████ to falsely accuse me of sexual harassment, and the firm with these lies appears to be acting in a position as employer to absorb the legal liability for the torts it directed its employee, ████, to engage in.

230.    On information and belief, the firm wrote the report in the manner it did to chill any ability for me to dispute it (by making disputing it an independent grounds for my "cancellation" – this has worked.)

231.    On information and belief, this is the first instance in American industrial history of a firm directing a female employee to falsely accuse an employee of sexual harassment as a pretextual means of forcing his termination for cause and concealing a racial motive.

232.    On or around January 29, I received a notice that my health benefits would be terminated effective January 31, 2021.

233.    On or around May, 2021, I received a box containing my personal effects from Shipman & Goodwin. My Boston College diploma was among the effects. When I unwrapped the packaging, I found that the glass of my diploma frame had been smashed to pieces.

234.    On information and belief, Dolphin directed ████, a Black man and the manager of office services, to smash the glass of my diploma because I am an "oppressor" who is being violently destroyed and cast out by Dolphin.

235.    On February 24, 2021, I sent a letter disputing the investigation findings to Anne Littlefield, Leander Dolphin, ████████████ and received no response.

236.    On March 11, 2021 I sent ████ a letter requesting a settlement conference and to discuss a strategy to extricate ourselves from this situation. I received no response.

237.    On March 25, 2021, Dolphin responded on ████ behalf to my March 11 letter. Dolphin's letter threatens to commence ethics proceedings against me for requesting a settlement conference, and threatens a defamation suit for my claim in the letter that she fabricated lies about me.

238.    On April 2, 2021, I responded to Dolphin's letter, citing the quotation from the November 11 call cited above at paragraph 183, claiming retaliation, and threatening my own lawsuit.

239.    In the March 25, 2021 letter, Dolphin effectively consents to her bias in the investigation by taking on the posture of ████ personal attorney. It is apparent from this communication, and the facts as a whole, that Dolphin directed ████ to file a false complaint of sexual harassment against me, with the intention of causing my disbarment, termination, and arguably, my death.

240.    Leander Dolphin is a dangerous, violent racist and political extremist who has engaged in unspeakable, criminal abuse of the employment relationship and clear employment discrimination.

241.    Dolphin's violent treatment of me is because I refused to consent to my own unlawful, discriminatory termination on the basis of my race.

242.    In a "Legal Collaborative for Diversity" zoom teleconference on February 24, 2021 where she was a panelist, and in which the Mansfield Rule, among other things, was discussed, Dolphin and others vigorously discussed strategies for circumventing Title VII of the Civil Rights Act in firing high performing white employees. In

- 26 -

response to the following prompt from "Marcus Peters" (Indelicato), "If you have a majority non-diverse workforce with high performing employees and there isn't sufficient growth in the business to increase overall headcount, what are some strategies for creating headcount flexibility for more diverse hiring without violating the rights of the white employees?", Dolphin and others enthusiastically talked about tearing down whites through a variety of surreptitious means.

243.   Dolphin and others also vigorously responded to the following question posed by "Marcus Peters" (Indelicato) "What is a good message to employees who say that making race or gender a consideration in employment decisions is wrong, no matter if it benefits diverse candidates?  Do they have a point, that making race a consideration is wrong, for better or worse?" that an issue like this really relates to the company's values, and that at Shipman, this is considered the cultural norm.

244.   In the same conference, in response to a question from "Theresa Guertin" "Similar question to Marcus – what would the panelists recommend to say to colleagues who feel like it isn't an employer's "place" to discuss racism (or gender inequality, or other social justice issues) in the workplace through town halls or other open forums" Dolphin responded that "This really relates to the company's values.  If the company has prioritized diversity, equity and inclusion, it is important to have courageous conversations so that societal and workforce changes could happen."

245.   In the February 24 conference, an individual from DiversityLab (responsible for Mansfield Certification) all companies that are Mansfield certified maintain and submit spreadsheets detailing diversity headcount by law firm department, etc., and regularly provide this information to DiversityLab.

246.   On April 8, 2021, I filed for unemployment insurance benefits with the State of Connecticut.  Employees terminated for cause, for engaging in misconduct such as I allegedly did, are not entitled to unemployment insurance benefits.  The state of Connecticut granted my claim and therefore has conceded that I was wrongfully terminated.  The firm did not oppose the State's finding.

247.   In April, 2021, I had a call with Dolphin and Littlefield in which I broke down crying and asked them to please help me in any way they could.  During this call I discussed the Bible, particularly the Sermon on the Mount, Gospel of Matthew, and how I would be willing to do anything just to have my life back so that I could get back on my feet and earn money for food.  Dolphin coldly responded that she would agree not to oppose my request for Connecticut UI benefits in exchange for a full and blanket release of claims.  I obviously declined this request.  Dolphin is a disgusting, violent, racist monster.

248.   In May and July, 2021, I sent letters to the Firm's management committee attaching evidence of ██████ clearly false claim, and received no response.  The July letter requested that the firm produce text messages presented by ██████ to Hermann in connection with her original complaint, and alleged that the firm was actively manipulating my job search in an ill-fated attempt to paint me as a low performer (so as to distance myself from ██████.  A false narrative around performance is the only false narrative Shipman can control at this point.

249.   The firm has never offered me a penny in severance.

250.  On information and belief, the firm has not aided me in my employment search in any respect and has in fact actively spread false rumors about me to prevent me from ever practicing law again.

251.  On October 1, 2021, I sent a letter to ████████████████████████ requesting that she step in and counsel ██████ about the ethics violations she engaged in, and that absent intervention I would file ethics charges against ██████ Dolphin and others for their disbarrable misconduct. I received no response.

252.  On information and belief, ██████ helped "cover up" ██████ actions by participating in a conference through the ██████████████████████████████ January, 2021, entitle ██████████████████████████████████████████████ ██████████████████████████ ' moderated by ████████.

253.  On information and belief, ██████ worked to defame my reputation with this conference by presenting me as an evil oppressor who she has destroyed by force and overcome me with her racial superiority. The conference appears to paint ██████ as more talented than me, and that I was in some way holding back her career advancement. It paints me as a lazy, undeserving white who only had the job because of privilege. This is yet another poisonous, disgusting lie. I have had a much harder life than ██████ who is from a very wealthy family.

254.  In October, 2021, the firm responded to my October 1, 2021 outreach to ██████ ██████ by providing the same defamatory sampling of text messages to the Hartford Police Department that ██████ had provided to Hermann in September, 2020.

255.  On October 16, 17, and 18, 2021, I had teleconferences with an Officer ██████ ██████████ of the Hartford Police Department, in which ██████████ inter alia, threatened to throw me in jail or otherwise have me forcibly confined as a mentally unstable individual, without reason whatsoever.

256.  On information and belief, I was only not jailed or forcibly confined as a result of these calls because I recorded the calls, therefore limiting ██████████ ability to lie about the things I said or about my mental state. Before learning that I was recording, ██████ suggests that he is going to send a social worker to my apartment to confine me, and paints me as a violent, unstable maniac, describing my October 1 letter as a "manifesto".

257.  On information and belief, Dolphin intended to have me thrown in jail to be physically harmed or killed by other Antifa members in jail.

258.  On information and belief, the firm intended to use this "trumped-up" unlawful harassment charge to create a convenient means to disbar me before I could file legal ethics charges against ██████ Dolphin or others.

259.  On information and belief, the firm knowingly filed a false police report as a means of silencing me and resolving this legal dispute using lies and violence.

260.  On information and belief, the firm was aware that these text messages were defamatory and that the police harassment was intended to cause me emotional distress, fear, and anger.

261.  On information and belief, the firm filed a false police report against me to prevent me from filing ethics charges against the firm prior to the firm's hosting an October 20, 2021 diversity conference involving several law firms in the region.

262.  On October 16, 2021, I received the text messages I requested in July from the firm. The text messages make clear that ██████ falsely accused me.

263.   On information and belief, the firm withheld this evidence from me to prevent me from clearing my name and restoring my career and reputation prior to ███████ resigning from the firm in early November, 2021.

264.   On information and belief, the firm intended to cause me to be put in jail so that I could not do anything, or tell any firm employee, about what happened to me without going to jail.  The firm is trying to intimidate me into silence, as they have been doing for over a year now.

**Conclusion**

The actions of the management of the law firm Shipman & Goodwin LLP both on and after my termination for cause on January 26, 2021 are together some of the most despicable and egregious examples of racially-motivated hatred and violence in the history of American industry.  The law firm repeatedly abused its power over me as employer to force me to bend the knee to an ideology that I do not believe in for very principled and good reasons, and that which was clearly going to cause me immense economic, professional and psychic harm, and did cause such harm.

Shipman and its management should be deeply ashamed of the things that they have done to me.  Shipman has clearly engaged in a series of racially-motivated, violent instances of defamation, violation of constitutional rights, discrimination and retaliation against me that are at best a departure from norms and at worse, violent criminal behavior prosecutable under federal and state law.  The intent of the Leander Dolphin was very obviously to destroy my life, disbar me, and even cause my death because I am an "Oppressor."  Worse, the firm attempted to provoke me into a violent, aggressive response to further "cancel" me, and therefore shame, abuse, exclude and torture me for just trying to have a career and clear my name – in other words, for pursuing my basic human and civil rights.

Shipman has engaged in employment discrimination within the meaning of Title VII of the Civil Rights Act of 1964 by attempting to manufacture a pretextual performance related basis for my termination, directing ███████ to falsely accuse me of sexual harassment as a pretextual means of concealing my race-related termination, for terminating me for cause knowing that I had done nothing wrong whatsoever and had been falsely accused, for knowingly disregarding clearly exonerating and exculpatory evidence despite my repeated pleas to contrary, for violently retaliating against me for taking any action whatsoever to clear my name, and actively seeking to cause my death, destruction, forcible confinement and disbarment simply because of my race (including the following intersectional components) and independently on the basis of my Christian religion, color, gender, national origin, sexual orientation and political affiliation, for which I am owed substantial monetary and equitable damages.  The law firm did all it did to me knowing for a fact that I did nothing wrong, and knowing for a fact that they did not fire a similarly situated Jewish lawyer named ███████ even though he was guilty of multiple instances of the underlying offense.  The firm did all it could to lie and paint me as a sexual harasser, but I am not.  On the whole, it is truly stunning and exemplary misconduct that one can't imagine would ever happen in the United States, much less to a lawyer in its legal industry.

It is obvious that if the races were reversed, this would the clearest example of discrimination in history. We must remember that Black people can be racists too, and Dolphin surely is one. I wish that weren't the case, but it clearly is.

I can tell you that never in my life would I ever dream of treating a person of color (or a Jew) like this, for any reason, period end of story. Not because I would get caught, which I would, but because it is a horrible thing to do to somebody. I would never do something like this to another human being for any reason. I forgive ████████ and Dolphin because that is what my religion tells me to do in a situation like this, and I hope they learn something from this.

Shame on Shipman & Goodwin LLP and shame on anyone who believes that this type of outright evil, tyranny and violence is in any way the right answer for our society or anyone in it.

Diversity is a critical goal which we all must strive for. But not at the expense of basic civility. We must work together as Americans, not violently hurt and destroy one another on the basis of skin color. It just divides us more, and hate is never the answer. Not ever.

Sincerely,

_____/s/_____
Joe Indelicato

**ATTACHMENT 2**
TO
ADDENDUM TO FORM PRO SE 7
(Docket Sheet 3:22-mc-3-KAD (D. Conn.))

# U.S. District Court
## District of Connecticut (New Haven)
## CIVIL DOCKET FOR CASE #: 3:22-mc-00003-KAD

Indelicato v. Shipman & Goodwin LLP                     Date Filed: 01/17/2022
Assigned to: Judge Kari A. Dooley                       Jury Demand: None
Cause: Motion to Compel                                 Nature of Suit: 890 Other Statutory Actions
                                                        Jurisdiction: Federal Question

**Petitioner**

**Joseph Indelicato**                represented by    **Joseph John Indelicato , III**
                                                       30 Arbor St. #422
                                                       Hartford, CT 06106
                                                       518-810-4537
                                                       Email: jindelicato3@gmail.com
                                                       *LEAD ATTORNEY*
                                                       *ATTORNEY TO BE NOTICED*

V.

**Respondent**

**Shipman & Goodwin LLP**

| Date Filed | # | Docket Text |
|---|---|---|
| 01/17/2022 | 1 | Emergency MOTION Petition for Preservation of Evidence *pursuant to FRCP 27* by Joseph Indelicato.Responses due by 2/7/2022 (Attachments: # 1 Exhibit 1_EEOC Charge (Redacted), # 2 Exhibit 2_Misc. Correspondence, # 3 Exhibit 3_Misc. Correspondence, # 4 Exhibit 4_Form 161 NRTS, # 5 Exhibit 5_Misc. Correspondence, # 6 Exhibit 6_Misc. Correspondence, # 7 Exhibit 7_FY19-20 Worksharing Agreement, # 8 Exhibit 8_Misc. Correspondence, # 9 Exhibit 9_Misc. Correspondence, # 10 Exhibit 10_Form of Subpoena, # 11 Memorandum in Support MOL in Support)(Indelicato, Joseph) (Entered: 01/17/2022) |
| 01/17/2022 | 2 | NOTICE of Appearance by Joseph John Indelicato, III on behalf of Joseph Indelicato *pro se* (Indelicato, Joseph) (Entered: 01/17/2022) |
| 01/17/2022 | 3 | CERTIFICATE OF SERVICE by Joseph Indelicato re 1 Emergency MOTION Petition for Preservation of Evidence *pursuant to FRCP 27 and associated exhibits by electronic mail* (Indelicato, Joseph) (Entered: 01/17/2022) |
| 01/17/2022 | | Judge Sarala V. Nagala added. (Anastasio, F.) (Entered: 01/18/2022) |
| 01/17/2022 | 7 | ELECTRONIC FILING ORDER FOR COUNSEL - PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER Signed by Judge Sarala V. Nagala on 01/17/2022.(Fazekas, J.) (Entered: 01/19/2022) |
| 01/18/2022 | 4 | Docket Annotation: The filing fee ($49.00) or ifp motion was requested to be received by the Clerk's Office by 4pm today, Tuesday January 18, 2022. (Anastasio, F.) (Entered: 01/18/2022) |

| 01/18/2022 | 5 | Emergency MOTION Recusal by Joseph Indelicato.Responses due by 2/8/2022 (Indelicato, Joseph) (Entered: 01/18/2022) |
|---|---|---|
| 01/18/2022 | 6 | ORDER denying 5 Emergency Motion for Recusal. Title 28, United States Code, Section 455 provides that a judge shall disqualify herself "in any proceeding in which [her] impartiality might reasonably be questioned." The Second Circuit has held: "A suggestion that a judge cannot administer the law fairly because of the judge's racial and ethnic heritage is extremely serious and should not be made without a factual foundation going well beyond the judge's membership in a particular racial or ethnic group. Such an accusation is a charge that the judge is racially or ethnically biased and is violating the judge's oath of office.... The core constitutional obligation of a federal judge is to decide between adversary positions. A judge should be free to carry out that obligation without fear of insulting conduct or statements concerning his or her impartiality and integrity...." *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 138 F.3d 33, 38 (2d Cir. 1998) (upholding imposition of sanctions against attorneys who questioned a judge's impartiality based on the judge's ethnicity).<br><br>Petitioner Indelicato's motion claims that his "accuser" in the underlying matter is South Asian and, because the undersigned is also South Asian, the undersigned is likely "already aware of the facts of his case." ECF No. 5 at 1. He further states that "the potential impact the requested evidence could eventually have on the reputation of South Asian lawyers everywhere" is a "particularly strong ground[] for recusal." *Id.* at 2. Finally, he surmises that the undersigned knows his "accuser" because the "accuser" is a Board Member of the South Asian Bar Association of Connecticut. *See id.* at 1-2.<br><br>The Court rejects Petitioner's offensive suggestions. The undersigned does not know Petitioner's "accuser," whom the Court believes is named in correspondence attached as ECF No. 1-9, and had no prior knowledge of this matter before it was assigned to the undersigned. The suggestion that the Court would rule in Petitioner's case not on the law and the facts presented to the Court, but instead based on the undersigned's ethnicity and "the potential impact... on the reputation of South Asian lawyers" is entirely unfounded. The Court finds this is not a matter in which the undersigned's impartiality might reasonably be questioned. *See* 28 U.S.C. § 455. Therefore, the Emergency Motion for Recusal is DENIED.<br><br>Signed by Judge Sarala V. Nagala on 01/18/2022. (Kuegler, Adam) (Entered: 01/18/2022) |
| 01/19/2022 | 8 | Emergency MOTION Recusal based on appearance of impropriety, apparent bias, conflicted relationships (South Asian Bar Association of Connecticut) *audio exhibits 3, 4, 5 to be delivered to Court* by Joseph Indelicato.Responses due by 2/9/2022 (Attachments: # 1 Exhibit SABAC Chat, # 2 Exhibit Ethics Letter to SABAC Member)(Indelicato, Joseph) (Entered: 01/19/2022) |
| 01/19/2022 | 9 | ORDER. This morning, following last night's ruling on Petitioner's Emergency Motion for Recusal (ECF No. 5 ) and prior to receiving Petitioner's renewed Motion for Recusal (ECF No. 8 ), one of the law clerks presently employed by the Court, received an unsolicited *ex parte* communication from a prior acquaintance. It appears this acquaintance is employed by a law firm that has represented Respondent in connection with Petitioner's claims. The law firm has not appeared in this matter for the Respondent. The communication read in full:<br><br>"Hey man! Had to shoot you a text about this. Im currently drafted on a (*sic.*) an emergency service matter that was just assigned to judge Nagala. The matter is Joseph Indelicato vs Shipman & Goodwin. Just wanted to say I got a nice chuckle out of your order to deny his petition for judge Nagala to recuse herself because of her race. The |

plaintiff is absolutely bonkers. I don't know if you read his entire CHRO complaint but if you didn't and have some time, it's a fantastic read. Alo (*sic.*) his email signature to us is 'Camper, Hartford Concentration Camp' so, there's that too."

After being alerted to the above communication, the Court considered the best course of action. The law clerk who received the communication was instructed not to respond to the sender. The law clerk was immediately removed from working on the matter and was screened from further involvement in it. The Court then considered the standard for recusal. Title 28, United States Code, Section 455 provides that a judge shall disqualify herself "in any proceeding in which [her] impartiality might reasonably be questioned." Section 455 is intended "to promote public confidence in the integrity of the judicial process" and to "avoid even the appearance of partiality." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988). The Second Circuit advises that the relevant questions are: "Would a reasonable person, knowing all the facts, conclude that the trial judge's impartiality could reasonably be questioned? Or phrased differently, would an objective, disinterested observer fully informed of the underlying facts, entertain significant doubt that justice would be done absent recusal?" *El Omari v. Kreab (USA) Inc.*, 735 F. App'x 30, 31 (2d Cir. 2018) (quoting *United States v. Bayless*, 201 F.3d 116, 126 (2d Cir. 2000)). "[W]hat matters is not the reality of bias or prejudice but its appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994).

Unfortunately, the Court fears that, given the above unsolicited *ex parte* correspondence, "an objective, disinterested observer fully informed of the underlying facts" could "entertain significant doubt that justice would be done absent recusal." *El Omari*, 735 F. App'x at 31. This fear is especially well-founded in light of the allegations contained in the petition concerning fairness to Petitioner. *See, e.g.* ECF No. 1, 44.

Accordingly, in light of the unsolicited *ex parte* communication received this morning, the Court has decided *sua sponte* to recuse itself from any further participation in this matter. To be clear, the Court's decision on this matter is entirely unrelated to the racial or ethnic background of anyone involved in this case, or any other argument raised in Petitioner's filings at ECF Nos. 5 and 8 .
Signed by Judge Sarala V. Nagala on 1/19/22. (Marks, Joshua) (Entered: 01/19/2022)

| 01/20/2022 | | Filing fee received from Joseph Indelicato III: $ 49.00, Receipt Number #730262 (Peterson, M) (Entered: 01/20/2022) |
|---|---|---|
| 01/20/2022 | 10 | ORDER OF TRANSFER. Case reassigned to Judge Kari A. Dooley for all further proceedings. Signed by Judge Sarala V. Nagala on 1/20/2022.(Bozek, M.) (Entered: 01/20/2022) |
| 01/20/2022 | 11 | ORDER denying as moot 8 Emergency Motion for Recusal. Signed by Judge Kari A. Dooley on 1/20/2022. (Sweeney, Kevin) (Entered: 01/20/2022) |
| 01/21/2022 | 12 | ORDER denying 1 Petition to Perpetuate Testimony. The Court has reviewed the 1 Petition to Perpetuate Testimony filed pursuant to Rule 27(a) of the Federal Rules of Civil Procedure through which Petitioner seeks to subpoena certain records from T-Mobile US, Inc (T-Mobile). Petitioners seeking discovery under Rule 27 must (1) "furnish a focused explanation of what they anticipate any testimony would demonstrate"; (2) "establish in good faith that they expect to bring an action cognizable in federal court, but are presently unable to bring it or cause it to be brought"; and (3) "make an objective showing that without a Rule 27 hearing, known testimony would otherwise be lost, concealed, or destroyed." *In re Petition of Allegretti*, 229 F.R.D. 93, 9598 (S.D.N.Y. 2005). Here, Petitioner asserts that he is the anticipated plaintiff in an action to be brought against the law firm of Shipman & Goodwin LLP, an action which purports to be cognizable in the |

courts of the United States insofar as it will include allegations of employment discrimination. Petitioner further describes the importance of the documents he seeks to the merits of his anticipated claims. Petitioner also alleges specific facts tending to establish that the evidence he seeks will be lost if this discovery is not permitted. However, a petitioner must also demonstrate that he "cannot presently bring" the anticipated lawsuit. Rule 27(a)(1)(A). *See also Marshall v. Madoff*, 2015 WL 2183939 *2 (S.D.N.Y. May 11, 2015) (denying Rule 27(a) petition where petitioners did not sufficiently explain why the anticipated complaint could not be "brought presently"). This requirement is not met simply if it would be "difficult or inconvenient" to bring the anticipated action. *Id.* (citing Wright, Miller & Marcus, *Federal Practice and Procedure* § 2072 at 39394). Indeed, "[t]he rule insists on necessity and is not met by convenience or tactical preferences." 6, James W. Moore, *et al.*, *Moore's Federal Practice*, § 27.13 2 (3d. ed. 2020). On this issue, Petitioner acknowledges his receipt of a release from the United States Equal Employment Opportunity Commission (EEOC) and so-called "right to sue" letter. Although he challenges the EEOC's conduct with respect to his case, Petitioner recognizes the ability to bring his federal claims. He offers however that "filing suit now will nullify his chances of securing legal employment before the 90-day Form 161 filing period expires, and thus will destroy any practical hope for the parties to resolve the matter outside of court." ECF No. 1 at 6. He also points to ambiguity with respect to the status of his case with the Connecticut Commission on Human Rights and Opportunities (CHRO). While these circumstances may present difficult decisions as to whether to bring the anticipated action, they do not establish an inability to do so.

In addition, Rule 27(a)(1)(E) requires the petition to state the address of each deponent. This petition does not do so. Further, Rule 27(a)(2) requires that the petition be served on Respondent "[a]t least 21 days before the hearing date" along with "a notice stating the time and place of the hearing." But petitioner did not provide proper notice to and service upon the Respondent, Shipman & Goodwin LLP, as required by Rule 27(a)(2). These procedural shortcomings are also reason for the Court to deny the petition. *See Melohn v. Stern*, No. 20-CV-05536 (PMH), 2021 WL 1178132, at *4 (S.D.N.Y. Mar. 29, 2021) (finding both a violation of Rule 27(a)(1)(E) and a violation of Rule 27(a)(2) to each be, by themselves, sufficient reason for denying the petition).

The Petitioner requests, in the alternative, that the Court permit discovery pursuant to Rule 26(d)(1) and 45. The Court disagrees that these rules are available under these circumstances, but Petitioner is free to renew this request if he commences an action against Shipman & Goodwin, LLP. Accordingly, the Petition is DENIED. Signed by Judge Kari A. Dooley on 1/21/2022. (Sweeney, Kevin) (Entered: 01/21/2022)

| 01/26/2022 | 13 | Letter from Lori B. Alexander, Office Managing Shareholder dated 1/26/2022. (Fanelle, N.) (Entered: 01/27/2022) |

---

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/05/2022 20:29:48 | | |
| **PACER Login:** | jindelicato4537 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:22-mc-00003-KAD |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

# **ATTACHMENT 3**
## TO
## ADDENDUM TO FORM PRO SE 7
## (Form 161 – Notice of Right to Sue)

EEOC Form 161 (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Joseph J. Indelicato, III<br>30 Arbor St., Apt. 422<br>Hartford, CT 06106 | From: | Boston Area Office<br>John F. Kennedy Fed Bldg<br>15 New Sudbury Street, Room 475<br>Boston, MA 02203 |
|---|---|---|---|

| ☐ | *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))* | | |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 523-2021-00464 | Lillian Marti,<br>Investigator | (617) 565-3203 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

*Feng A* (signature)

**Feng K. An,**
**Area Office Director**

November 30, 2021

*(Date Issued)*

Enclosures(s)

cc:

**Maria Drag**
**SHIPMAN & GOODWIN LLP**
**One Constitution Plaza**
**Hartford, CT 06103**

Enclosure with EEOC
Form 161 (11/2020)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice.  Therefore, you should **keep a record of this date**.  Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope or record of receipt, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *issued* to you (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.  If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months** of this Notice.  (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

Enclosures(s)

cc: